Peter J. LIMONE, et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV. 02–10890–NG.

United States District Court,
D. Massachusetts.

July 17, 2003.

Michael Avery, Suffolk University Law School, Boston, MA, Juliane Balliro, Perkins, Smith & Cohen, LLP, Boston, MA, for Carolyn Limone Zenga, Janine Limone Arria, Olympia Limone, Paul Limone, Peter J. Limone, Peter J. Limone, Jr., Saverio Tameleo, Plaintiffs.

Richard D. Bickelman, Deutsch Williams Brooks DeRensis & Holland, P.C., Boston, MA, John Cavicchi, East Boston, MA, for Roberta Wemer, Plaintiff.

James M. Chemetsky, City of Boston Law Department, Boston, MA, for Frank L. Walsh, Defendant.

John M. Connolly, Meyer, Connolly & Sloman, Boston, MA, for Dennis Condon, Defendant, Pro se.

Thomas R Donohue, City of Boston Law Department, Boston, MA, for Frank L. Walsh, Defendant.

John C. Foskett, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA, for Roberta Wemer, Plaintiff.

Lawrence R. Holland, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA, for Roberta Wemer, Plaintiffs.

William T. Koski, Koski & Keams LLP, Boston, MA, for Carolyn Limone Zenga, Janine Limone Arria, Olympia Limone, Paul Limone, Peter J. Limone, Peter J. Limone, Jr., Saverio Tameleo, Plaintiffs.

Edward J. Lonergan, Boston, MA, for John Connolly, Defendant.

Michael B. Meyer, Meyer, Connolly & Sloman, Boston, MA, for Dennis Condon, Defendant, Pro se.

E.P. Mullane, Mullane, Michel & McInnes, Cambridge, MA, for John Connolly, Defendant.

E. Peter Parker, Boston, MA, for H. Paul Rico, Defendant.

Margaret Krawiec, U.S. Atty., for U.S.

*MEMORANDUM AND ORDER RE:*
*MOTIONS TO DISMISS*

GERTNER, District Judge.

Plaintiffs [1] accuse the defendants, the United States and various federal and state law enforcement officers,[2] of framing Peter Limone, Henry Tameleo, and Louis Greco for the murder of Edward "Teddy" Deegan on March 12, 1965. As a result of defendants' misconduct, plaintiffs allege, the trio were convicted of Deegan's murder in 1968 and sentenced to death, sentences that were later vacated and replaced with life imprisonment. Over the next several decades, the defendants covered up the real facts, allowing the trio to languish in prison for crimes they did not commit. In fact, plaintiffs allege, Deegan was killed by FBI informants Vincent "Jimmy" Flemmi and Joseph Barboza, along with Roy French, Ronald Cassesso, and Joseph Martin.

In 2001, after serving nearly thirty years, Limone was released, his conviction vacated, and all charges dropped on the basis of newly revealed information. That information suggested he and the others had been convicted because of perjured testimony and suppressed exculpatory evidence. By then, Greco and Tameleo had died in prison, in 1995 and 1985, respectively. The complaints seek damages under a variety of federal and state law causes of action.[3]

Pending before me are multiple motions to dismiss the case on various legal grounds.[4] At this point early in the litigation, prior to discovery and presentation of proof, the plaintiffs' allegations are presumed to be true. The case can be dis-

1. Two sets of plaintiffs and their counsel have filed two similar but separate amended complaints. One complaint was filed on behalf of Peter J. Limone, Olympia Limone, Peter J. Limone, Jr., Paul Limone, Carolyn Limone Zenga, Janine Limone Arria, Saverio Tameleo, Administrator of the Estate of Enrico (Henry) Tameleo, Saverio Tameleo, Administrator of the Estate of Jeanette Tameleo, and Saverio Tameleo (collectively, "the Limone and Tameleo plaintiffs"). The other complaint was filed on behalf of Roberta Werner, Executrix of the Estate of Louis Greco, Roberta A. Werner, Administratrix of the Estate of Louis Greco, Jr., and Roberta Werner (collectively, "the Werner Plaintiffs").

2. The Limone and Tameleo Plaintiffs have sued the United States (hereinafter "the government"); former FBI agents H. Paul Rico, Dennis Condon, John Morris, John Connolly, and James Handley; former Boston police officer Frank L. Walsh; and former Chelsea police officer Robert Renfrew. The Werner plaintiffs have sued the United States, Rico, Condon, Walsh, unknown federal agents, and unknown state officers.

3. The Limone and Tameleo complaint brings claims against the United States under the Federal Tort Claims Act ("FTCA") for the common law torts of (i) malicious prosecution, (ii) intentional infliction of emotional distress, (iii) negligent supervision of employees, and (iv) civil conspiracy (Count I); *Bivens* claims against individual federal agents under the 1st, 4th, 5th and 8th Amendments (Count II); section 1983 claims against individual state officers under the 1st, 4th, 5th, 8th, and 14th Amendments (Count III); conspiracy claims under *Bivens* and § 1983 (Count IV); malicious prosecution (Count V); conspiracy (Count VI); and intentional infliction of emotional distress (Count VII).

The Werner complaint brings FTCA claims against the United States for malicious prosecution (Count I), intentional infliction of emotional distress (Count II), loss of consortium (Count III), loss of parental consortium (Count IV), and civil conspiracy (Count V); *Bivens* claims against federal agents for violation of constitutional rights (Count VI); and section 1983 claims against state officers for violation of constitutional rights (Count VII).

4. Pending Motions to Dismiss were brought by the United States [documents ## 70 and 73], Dennis M. Condon [documents ## 75 and 78], H. Paul Rico [document # 110], and Frank L. Walsh [documents ## 113 and 116].

missed *only* if the claims are in some way *legally* deficient.

They are not. The defendants' voluminous motions to dismiss miss the forest for the trees. They argue over and over again that certain facts taken in isolation do not state actionable claims, ignoring the big picture. The government, plaintiffs say, framed three innocent men for murder, obtained death sentences against them, and then allowed them to be wrongfully held in prison for decades after the death sentences were vacated.

It is hard to conceive of accusations that shake the legal system closer to its foundation, that would do more to challenge this nation's most basic assumptions of honesty, fairness, and trust in the administration of justice. And if they prove true—which is the subject of proceedings for another day—they offer a cautionary tale at a time when courts and legislatures seem more and more prone to arrogate unchecked authority to law enforcement officers and prosecutors—all in the name of "national security."

For the reasons explained below, the defendants' motions are all **DENIED**.

## I. *LEGAL STANDARD*

In adjudicating motions to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept all allegations in the complaints as true and all reasonable inferences must be drawn in favor of the plaintiffs. *See Rock-* *well v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1st Cir.1994). The complaints should be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).[5]

## II. *FACTUAL ALLEGATIONS*[6]

### A. *Introduction*

Louis Greco, Peter Limone, and Henry Tameleo were convicted in 1968 in the Superior Court of Suffolk County, Massachusetts, for the March 12, 1965 murder of Edward "Teddy" Deegan. They received death sentences that were later vacated and replaced with sentences of life imprisonment.

In fact, plaintiffs allege, Deegan was killed by Vincent ("Jimmy") Flemmi, Joseph Barboza, Roy French, Joseph Martin, and Ronald Cassesso.[7] Greco, Limone, and Tameleo were innocent of the crime.[8] Their wrongful convictions resulted from the acts and omissions of the defendants. Specifically, FBI agents H. Paul Rico, Dennis Condon, and others developed relationships with Flemmi and Barboza as FBI informants over the course of their investigation of organized crime in New England. While working with the FBI in this capacity, Flemmi and Barboza were allowed and perhaps even encouraged to

---

**5.** The government points out that in adjudicating a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the Court may consider extrinsic materials and test the truth of plaintiffs' allegations. *See Dynamic Image Technologies, Inc. v. United States*, 221 F.3d 34, 37–38 (1st Cir.2000). However, while the government does challenge the Court's subject matter jurisdiction by invoking, *inter alia*, exceptions to the Federal Tort Claims Act, it does not offer evidentiary materials to contradict any of the plaintiffs allegations, with the sole exception of the original indictment in the underlying prosecution and the *nolle prosequi* of Roy French.

**6.** This summary of facts is based on the combined allegations contained in the two complaints, which largely overlap.

**7.** French, Martin, and Cassesso were convicted along with Limone, Tameleo, and Greco in 1968.

**8.** Joseph Salvati was also convicted of the crime. His sentence was commuted in 1997 and his conviction was vacated in 2001.

engage in various illegal activities, including murder, conspiracy, perjury, and other crimes. When Deegan was murdered, the defendants developed Barboza as a witness in the case in order to procure indictments against and convictions of Greco, Limone, Tameleo, and others even though the defendants knew that Barboza's testimony was fabricated. Moreover, in the succeeding decades the defendants engaged in an active cover-up and repeatedly failed to turn over information that they had received from informants concerning Deegan's actual killers, information that was exculpatory of Greco, Limone, and Tameleo.

### B. *Deegan Murder*

At the time of these alleged events, agents Rico and Condon were partners working out of the Boston FBI office with responsibility for investigating organized crime in New England. In the course of their work, they cultivated a number of relationships with confidential informants, including Flemmi, Barboza, and others. Rico, Condon, other agents, and their supervisors, including Special Agent in Charge James Handley, failed to follow proper procedures to handle these informants. As early as May 22, 1964, the agents were informed that Flemmi had stated that "all he wants to do now is kill people" and that his stated aspiration was to become the "number one hit man." As early as March 3, 1965, the agents were also advised that alleged crime boss Gennaro J. Angiulo had warned another alleged high-ranking mobster, Raymond Patriarca, that Flemmi "did not use sufficient common sense when it came to killing people."

Over the course of several months, the FBI also received information indicating that Flemmi specifically intended to kill Deegan. Agent Rico wrote in an October 19, 1964, memorandum that an informant reported that Flemmi wanted to kill Deegan and had asked the informant to go with him on the "hit." A memorandum from the Boston Office of the FBI to the Director of the FBI dated March 10, 1965 further indicated that an informant had reported that Flemmi and Barboza had contacted Patriarca to get his "OK" to kill Deegan. That same day, another informant reported to Rico that Flemmi indicated that Patriarca approved the "hit" and that a "dry run" had been made.

Yet Rico, Condon, Handley and other FBI agents did not warn Deegan and failed to take steps to prevent their informants, Flemmi and Barboza, from committing the murder. Ironically, it was Limone who, as early as October 23, 1964, had warned Deegan that Flemmi wanted to kill him.

Deegan was killed on March 12, 1965. The next day, an informant told Rico that Jimmy Flemmi had stated that Flemmi, Barboza, French, Cassesso and Martin had organized and committed the murder. Rico memorialized this information in a memorandum in which he reported that the information also had been transmitted to Officer Renfrew, then a captain in the Chelsea Police Department. One of the weapons used to kill Deegan was a .45 caliber handgun. On March 23, 1965, the FBI received information from an informant that Barboza claimed to have shot Deegan with a weapon of that caliber and deemed this information to be "very good." None of this information was revealed during the prosecution and post-conviction proceedings of Limone, Greco, and Tameleo.

### C. *Prosecution*

In the spring of 1967, FBI agents including Rico and Condon arranged to meet with Barboza. They induced Barboza to cooperate with their investigation of the Deegan murder by conveying false infor-

mation to Barboza through another informant that caused him to fear for his life. During these discussions, Barboza told the agents that he would not, under any circumstances, implicate Flemmi in the murder. Instead, Barboza falsely implicated Greco, Limone, and Tameleo. The agents nevertheless continued to develop Barboza as a witness even though they believed that Flemmi was involved in the murder. Rico, Condon, and Walsh took a formal statement from Barboza on September 12, 1967, in which he failed to implicate Flemmi. In addition, Barboza claimed that it was Greco who shot Deegan with the .45 caliber handgun—a statement that contradicted informant information, deemed credible by the FBI, that it was Barboza who pulled the trigger. In short, based on the information they had received both before and after the killing, Rico and Condon knew that Barboza would commit perjury before the grand jury investigating the Deegan murder.

Prior to Barboza's grand jury testimony, Rico and Walsh took at least one additional statement from Barboza in which he contradicted himself in several material respects concerning Greco's alleged involvement in the murder. Specifically, Barboza previously had stated that Greco left the Ebbtide Restaurant on the night of the murder with the .45 handgun in his possession; that Greco was wearing a brown topcoat; and that after the murder Greco returned to the Ebbtide Restaurant and informed Barboza that he was among those who had killed Deegan. A short time later, on October 16, 1967, Barboza stated to Rico and Walsh that Greco did not come into the Ebbtide Restaurant at all on the night of the murder; that he did not remember what Greco was wearing; and made no mention of any "admission" by Greco. None of the documents memorializing these contradictory statements were revealed prior to the year 2000. Barboza testified before the grand jury on

October 25, 1967 and an indictment was handed down the same day.

Prior to the trial, Rico, Condon, and Walsh arranged a meeting between Barboza and Anthony Stathopoulos, who was with Deegan at the time of the murder. Previously, Stathopoulos claimed to have seen only Cassesso and Martin at the murder scene. After this meeting, however, Stathopoulos claimed for the first time that the man with the gun looked like Greco.

Also prior to the trial, Boston Police Officer Frank Walsh interviewed a witness in Florida who provided an alibi for Greco. The witness, Barbara Brown, babysat for Greco's children when Greco was in Florida and showed Walsh a calendar indicating that she babysat for Greco's children in Florida on the night of the Deegan murder. Walsh falsely claimed that no such calendar existed.

In short, the state prosecution of Limone, Greco, and Tameleo was essentially procured by the FBI and nurtured thereafter by both federal agents and state officers who knew that the charges lacked basis. According to a July 31, 1968, FBI memo: "Garrett H. Byrne, District Attorney, Suffolk County, stated that prosecution was a direct result of FBI investigation and particularly noted development of principal government witness [sic], Joseph Baron, aka Barboza, and Robert Glavin. Byrne was extremely praiseworthy of cooperation between FBI and his office. SAS H. Paul Rico and Dennis M. Condon were instrumental in development of Baron and Glavin." Plaintiffs allege that the FBI embarked on this course of action and suborned perjury because it was attempting to develop Flemmi as an informant and did not want his involvement in the Deegan murder to be disclosed. Plaintiffs further allege that the defendants expressed no compunction about procuring false convictions for Deegan's murder because they assumed that Limone, Greco, and Tame-

leo, all of Italian ancestry, were involved in organized crime and had committed other crimes.

### D. *Cover–Up*

Plaintiffs allege that at various times from the murder of Deegan to the present, FBI agents Rico, Condon, John Morris, and John Connolly; other employees of the Department of Justice and FBI; and Officers Walsh and Renfrew engaged in numerous acts to cover up the above alleged facts and to keep secret information and evidence that would exculpate Limone, Tameleo, and Greco.

In or about 1970, Barboza recanted his trial testimony against Limone, Tameleo, and Greco in statements to James Southwood, William Geraway, Attorney F. Lee Bailey, and Attorney Gerald Alch.[9] Defendants later induced Barboza to withdraw his recantation and affirm his earlier false trial testimony. In 1971, Barboza was living in California as a participant in the federal witness protection program under the name Joseph Bentley. At that time, he shot a man named Clayton Wilson and was charged with first-degree murder. In 1972, Barboza wrote to Condon seeking assistance with the pending charge. Condon and Rico traveled to California to intercede with local authorities on Barboza's behalf. Barboza was permitted to plead guilty to second-degree murder and was sentenced to only five years imprisonment. Barboza ultimately was released from prison after serving less than three years.

In 1982, with the support of the Deegan family, who believed in his innocence, Limone filed a petition to commute his sentence with Massachusetts authorities. The defendants continued to withhold information that would have exonerated Limone. In addition, agents Morris and Connolly attempted to discourage members of the Massachusetts Advisory Board of Pardons from recommending commutation for Limone by providing false information directly and through U.S. Attorney William Weld. Notwithstanding this pressure, on August 1, 1983, the Board voted to recommend commutation of Limone's sentence. FBI agents including Morris and Connolly then channeled false information to the office of the Governor to discourage commutation. On September 20, 1983, Governor Dukakis denied the petition for commutation.

In an attempt at intimidation, FBI agents including Morris and Connolly caused state law enforcement officials and agents to investigate members of the Advisory Board of Pardons who had voted in favor of commutation to determine if they were influenced by organized crime. On December 21, 1987, the Board unanimously denied a hearing on a subsequent petition for commutation by Limone, after receipt of more false information from defendants.

In 1983 and 1986, Greco also applied for a commutation of his sentence. The Board recommended commutation on each occasion, but FBI agents sought to discourage Governor Dukakis, in 1985, and Governor Weld, in 1993, from granting the petition. In each instance, the petition was turned down.

### E. *Exoneration*

Tameleo and Greco died in prison in 1985 and 1995, respectively, prior to the

---

**9.** Bailey testified about his conversation with Barboza before a Congressional panel in 2000. According to Bailey, Barboza said that when Rico and Condon questioned him about the Deegan murder, he told Rico and Condon directly that he would falsely implicate persons whom the FBI wanted to be convicted of murder if the FBI permitted him, in turn, to falsely implicate other persons. One way or the other, plaintiffs allege that Barboza falsely implicated Greco, Limone, and Temeleo in the murder.

time when the facts recounted above came to light upon release of above-referenced FBI documents and other evidence in 2000. Limone remained in prison until January 5, 2001. His conviction was vacated and a new trial ordered on January 8, 2001. On January 30, 2001 the Suffolk County District Attorney's Office announced that it would drop all proceedings against Limone. In a written *nolle prosequi* filed with the Superior Court, the District Attorney's Office stated that newly discovered evidence, including FBI documents, had undermined the credibility of Barboza, the Commonwealth's principal witness, and had undermined the Commonwealth's theory of Limone's role in the murder. The *nolle prosequi* stated that after a thorough review of the facts, the Commonwealth "does not now have a good faith basis—legally or ethically—to proceed with any further prosecution of the defendant."

## III. UNITED STATES' MOTIONS TO DISMISS

Claims for damages against the United States itself (as opposed to individual officers) may be maintained only to the extent that sovereign immunity is waived by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671–2680. Subject to certain exceptions, the FTCA permits civil actions against the United States for personal injuries caused by the negligence of any employee of the government while acting within the scope of his or her office or employment under circumstances where a private person would be liable to the claimant. *See* 28 U.S.C. § 1346(b); *Wood v. United States*, 290 F.3d 29, 35 (1st Cir. 2002). The government's motions to dismiss therefore advance legal arguments that purport to bar FTCA liability for plaintiffs' allegations.

### A. Discretionary Function Exception to FTCA

The government contends that it is immune from liability because its decisions about matters such as how to conduct investigations, whom to prosecute, whether to disclose exculpatory evidence, and how to manage informants are "discretionary functions" in the meaning of the FTCA. However, the government's various characterizations of the plaintiffs' allegations are, at once, both too broad and too narrow. On one hand, it cannot be the case that the general law enforcement authority of the FBI precludes any tort actions based on the conduct in which its agents choose to engage pursuant to that authority. At the same time, this case is about much more than the minutiae of discrete FBI decisions, viewed in isolation, about whether to share particular pieces of a case file with third parties. At root, nothing about the outrageous and unconstitutional course of conduct alleged by the plaintiffs' implicates an actual exercise of choice or discretion that enjoys immunity under the statute. As I recently explained in another case:

> It is vitally important to recognize that 'the government may not immunize an otherwise tortious action simply by showing that the government took the action in order to implement some policy purpose. Instead, the courts must carefully disaggregate the government's course of conduct in order to focus on the specific action at issue and determine whether the action was truly grounded in policy.'

*Coyne v. United States*, 270 F.Supp.2d 104, 111 available at 2003 WL 21496377, *6 (D.Mass. May 30, 2003) (Gertner, J.) (quoting Peter H. Schuck and James J. Park, *The Discretionary Function Exception In the Second Circuit*, 20 Quinnipiac L.Rev. 55, 73 (2000)).

### 1. *Background Principles*

■ The "discretionary function" exception to the FTCA confers immunity over claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "The purpose of this exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'." *Coyne,* at ——, 2003 WL 21496377 at *6 (quoting *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)).

■ The First Circuit succinctly described the analytical framework to use when evaluating a "discretionary function" defense:

> First, an inquiring court must identify the conduct that allegedly caused the harm. Then, in determining whether Congress sought to shelter that sort of conduct from tort liability, the court must ask two interrelated questions: (1) is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments? If both of these queries yield affirmative answers, the discretionary function exception applies and the government is shielded from liability.

*Muniz–Rivera v. United States,* 326 F.3d 8, 15 (1st Cir.2003) (citing, *inter alia, United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) and *Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. 1954). The inquiry is highly "case specific, and not subject to resolution by the application of mathematically precise formulae." *Shansky v. United States,* 164 F.3d 688, 693 (1st Cir.1999).

### 2. *Identifying the Precise Conduct in Question*

■ The government attempts to sweep all of plaintiffs' allegations under the exception by characterizing the "challenged conduct" in terms that are, as I noted above, alternatively, excessively broad and excessively narrow. Under the government's theory, choices that bear any relationship to the FBI's broad authority to conduct investigations and manage its informants would be immune from liability, as would the most minute operational choices.

For example, suppose that agent Rico negligently injured a plaintiff in a car accident because he accelerated too abruptly while driving to a meeting with Barboza to discuss Barboza's prospective trial testimony. According to the government's reading of the discretionary function exception, the plaintiff would be unable to recover for his injuries for two reasons, both a broad ("macro") reason and a narrow ("micro") reason. At the "macro" level, Rico made a choice to drive, rather than taking a cab, a choice that was connected to his conduct of an investigation and management of Barboza. At the "micro" level, Rico made choices as a driver about how far to turn the steering wheel and how hard to push the accelerator. Because discretionary choices pervaded Rico's conduct in the exercise of his duties, the government would argue, his overall conduct is immune from suit in tort.

But this is not the law. As the Supreme Court explained:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mis-

sion connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert,* 499 U.S. at 325, n. 7, 111 S.Ct. 1267.

The key point is that "the inquiry focuses on discrete conduct—here, negligent driving—rather than the driver's official duties" or the individual, minute choices that he made in the process of driving. *Coyne,* 2003 WL 21496377 at *10. "Courts consistently focus on the particular events that proximately caused the injuries for which recovery is sought, not the broad policy authority pursuant to which particular actions were taken" nor the constituent subparts of those particular actions. *Id.* If it were otherwise, the government could always avoid liability by manipulating the lens of abstraction through which the complaint is viewed.[10]

Here, the plaintiffs allege that federal agents knowingly and intentionally encouraged and assisted Barboza to provide false testimony and worked actively with state authorities to obtain and sustain unjust convictions against innocent men and to cover up the criminal activities of Flemmi. This is the "challenged conduct" that must be assessed for coverage under the discretionary function exception.

### 3. *Is the Conduct Protected?*

There can be no question that the alleged conduct of federal agents in this case was not "discretionary" in the meaning of the statute. Even if the alleged conduct were somehow found to be discretionary, it is equally clear that this purported exercise of discretion is not of the sort that Congress intended to protect by the discretionary function.

■ Obviously, conduct cannot be "discretionary" if it violates the constitution, federal laws, or established agency polices and regulations. *See Muniz–Rivera,* 326 F.3d at 15 ("The jurisprudence of the FTCA permits us to classify these actions as non-discretionary only if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action"); *Avery v. United States,* 434 F.Supp. 937, 944 (D.Conn.1977) ("If trespasses in violation of government regulations are not 'discretionary functions' then, a fortiori, trespasses in violation of constitutional guarantees are not 'discretionary functions.'"); *Myers & Myers, Inc. v. United States Postal Serv.,* 527 F.2d 1252, 1261 (2d Cir.1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally").[11]

**10.** Allowing such manipulation would completely defeat the purpose of the *Berkovitz–Gaubert* test.

> First, even the most routine ministerial action by the lowest-level employee can be said to involve some judgment or choice. After all, the actor could have chosen to act differently, and might even have chosen to breach his duty. Were the [discretionary function exception] to encompass all actions as to which the actor had such choices, it would literally swallow the FTCA's general waiver of immunity. Second, even the most routine agency action can always be linked to some general policy

concern. After all, an agency action is ultra vires unless it is at least consistent with an authorizing statute or regulation .... To put the point in a more economistic way, virtually any action, public or private, that purports to be rational reflects some form of cost-benefit analysis.

*Coyne,* 2003 WL 21496377 at *10, 270 F.Supp.2d at 115 (quoting Peter H. Schuck and James J. Park, *The Discretionary Function Exception In the Second Circuit,* 20 Quinnipiac L.Rev. 55, 65 (2000)).

**11.** Defendants point out that there is no liability for constitutional torts under the FTCA. It is equally clear, however, that the fact that

There can be no doubt that suborning perjury and fabricating evidence violate the constitution. *See, e.g., Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942). It is equally clear that law enforcement officers have a constitutional duty to disclose exculpatory evidence to prosecutors. *See, e.g., Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) ("[C]onstitutional wrong results from the officer's failure to deliver material information to competent authorities.").[12]

It is thus not surprising that courts have rejected discretionary function defenses in the face of allegations analogous to those in this case. *See, e.g., Tri–State Hosp. Supply Corp. v. United States,* 142 F.Supp.2d 93, 100–101 (D.D.C.2001) (explaining that customs officials did not have discretion to lie under oath and that malicious prosecution claim could proceed); *Merritt v. Shuttle, Inc.,* 13 F.Supp.2d 371, 380 (E.D.N.Y.1998) (holding that conspiracy of FAA inspectors to place blame on pilot for near-crash was not covered by discretionary function exception); *Chandler v. United States,* 875 F.Supp. 1250, 1266 (N.D.Tex.1994) (holding that allegations based on bringing charges without probable cause and withholding of material information from prosecutors and grand jury are not barred by discretionary function exception); *Crow v. United States,* 659 F.Supp. 556, 569 (D.Kan.1987) (concluding

that discretionary function exception did not bar claim where inspector's memorandum and testimony contained inaccuracies and falsehoods).

Even if the conduct of federal agents could somehow be traced to choices that are constitutionally permissible, "it would be premature to find [the] conduct 'discretionary' prior to discovery of internal FBI and DOJ procedures which might bear on that conduct. Where an employee violates an established policy or regulation, 'there will be no shelter from liability.'" *Coyne,* 270 F.Supp.2d at 116, 2003 WL 21496377, at *11.

In *Glickman v. United States,* 626 F.Supp. 171 (S.D.N.Y.1985), the court confronted allegations that the CIA violated the constitution when it administered LSD to the plaintiff without his permission or knowledge. The court's comments in rejecting a discretionary function defense in *Glickman* are *a propos* to this case as well:

> What plaintiff is alleging is conduct of such a serious and malevolent nature as to be beyond any reasonable discretion on the part of a Government agency. Plaintiff is alleging something which does not involve normal regulatory activities or the weighing of policy factors within the scope of proper governmental power, but rather something which goes beyond the constitutional powers of the Government, and seriously violates the constitutional rights of a citizen. It cannot be said that Congress meant to with-

---

defendants also happened to violate the constitution does not preclude *other* claims that *are* actionable under the FTCA. Plaintiffs do not predicate FTCA liability on constitutional torts. Rather, they point out that constitutional violations defeat any "discretionary function" argument.

12. The government suggests that federal investigators have no obligation to disclose exculpatory information to state prosecutors

because the reported cases on disclosure obligations typically deal with disclosures from federal investigators to federal prosecutors or from state investigators to state prosecutors. But the government offers no cogent analysis of why this distinction should make the least bit of legal difference, particularly in a case such as this one, where federal investigators worked integrally with state prosecutors from the beginning.

draw this kind of allegation from judicial scrutiny under the "discretionary function" exception.

*Id.* at 175.

### B. *Perjury and Subornation of Perjury as Torts*

■ The government argues that perjury and subornation of perjury are not, themselves, actionable torts under state law. *See Phelps v. Stearns*, 70 Mass. 105 (1855) (explaining that there is no common law cause of action for perjury); *see also generally* 31 A.L.R.3d 1423 (1970). The government therefore concludes that perjury cannot be the basis for liability under the FTCA.

Plaintiffs simply and convincingly reply that they do not allege perjury to be actionable in tort. Rather, the fact of perjury is a significant piece of evidence, part of the "story" underlying claims based on the tort of malicious prosecution. *See Della Jacova v. Widett*, 355 Mass. 266, 268–69, 244 N.E.2d 580 (1969) (explaining that proof of perjury can underlie "lack of probable cause" element of malicious prosecution claim).

Again, the defendants argue repeatedly that specific facts, taken in isolation, are not actionable while ignoring their relevance as evidence in the broader narrative. In fact, the defendants appear engaged in a quixotic effort to dismiss isolated *facts*, when elementary logic and Rule 12 only contemplate dismissal of entire *claims*.

A simple analogy reveals the vacuity of this approach. For example, firing a gun may not, in itself, be actionable in tort, but the fact that a gun was fired is surely relevant to a civil assault claim. Similarly, even though perjury is not independently actionable in tort, the fact of perjury is surely relevant to a malicious prosecution claim. In other words, the fact that a certain subset of conduct, viewed in isolation, is not actionable in tort does not

somehow immunize the tortious end to which that conduct is directed.

### C. *"Initiation" of Prosecution*

■ The government argues that the tort of malicious prosecution cannot lie because the federal defendants did not "initiate" the state prosecution. At most, the government contends, the FBI transmitted information about the Deegan murder to state authorities. The government then cites a number of cases for the proposition that the mere provision of information to law enforcement, where the decision to prosecute is left to the independent "judgment and responsibility" and "uncontrolled choice" of others, does not give rise to a claim for malicious prosecution. *See, e.g., Correllas v. Viveiros*, 410 Mass. 314, 318, 572 N.E.2d 7 (1991) ("The mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution."); *Conway v. Smerling*, 37 Mass.App.Ct. 1, 4, 635 N.E.2d 268 (1994) ("If a citizen registers with the police an apprehension that a crime has been committed and leaves the matter to the judgment and responsibility of the public officers, that citizen, though having started the chain of events that led to legal process, cannot be charged with malicious prosecution."); *Ziemba v. Fo'cs'le, Inc.*, 19 Mass.App.Ct. 484, 488, 475 N.E.2d 1223 (1985) ("[T]he mere act of calling the police for aid does not rise to the level of instituting criminal proceedings.").

There are several problems with this argument. First, it begs the question: if the federal officers did not "initiate" the prosecution, who did? Law enforcement officers, such as the FBI agents here, are prototypical defendants in malicious prosecution cases because they gather the evidence that makes the case while prosecut-

ing attorneys themselves enjoy absolute immunity for bringing the case. *See Imbler v. Pachtman*, 424 U.S. 409, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). It is precisely the malfeasance of the investigators that is actionable when it causes prosecutors to pursue baseless charges. *See, e.g.,* 28 U.S.C. § 2680(h) (providing that FTCA malicious prosecution action can lie against federal investigative officers). Second, the cases cited by the government actually illustrate that a wide range of defendants *can* be liable for "initiation" of a malicious prosecution under appropriate circumstances when they are more than mere passive conduits of information. *See, e.g., Correllas,* 410 Mass. at 318–19, 572 N.E.2d 7 (noting that "it is well established that a person need not swear out a criminal complaint in order to be held answerable for malicious prosecution" and that an individual who "encouraged or demanded" that authorities institute criminal proceedings could be liable); *Conway,* 37 Mass.App.Ct. at 4–5, 635 N.E.2d 268 ("If [a] citizen presses the police to apply for a complaint, an action for malicious prosecution lies against the importuning citizen"); *Ziemba,* 19 Mass.App.Ct. at 488, 475 N.E.2d 1223 (noting that action could lie if defendant "demanded or directed the police to arrest [the plaintiff], that she furnished the police with false information to influence their actions, or that the police did not exercise independent discretion."). Third, the FBI agents in this case are alleged to have done much more than merely transmit information; they played a multifaceted "active role" in the prosecution. Essentially, plaintiffs contend, the defendants systematically manufactured evidence and cultivated witnesses from whom they suborned perjury. They then packaged and presented this information to state authorities with the specific intent of provoking the prosecution of Limone, Greco, and Tameleo while covering up the roles of Flemmi and Barboza. Thereafter,

they continued to collaborate closely with state prosecutors and worked assiduously to cover their tracks in the decades that followed.

■ Even if defendants did not, by themselves, "initiate" the prosecution, a person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." *Mitchell v. City of Boston,* 130 F.Supp.2d 201, 215 (D.Mass.2001) (Saris, J.) (citing Restatement (Second) of Torts § 655 (1976)); *see also Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988) (Posner, J.) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.").

### D. *"Favorable Termination" Element of Malicious Prosecution*

The government argues that the Tameleo and Werner [Greco] plaintiffs' claims must be dismissed because, unlike Limone, Tameleo and Greco died in prison before their convictions could be officially reversed. According to the defendants, the law always requires a "favorable termination" of the criminal prosecution before plaintiffs can bring a civil tort action based on those proceedings. Since Tameleo and Greco died in prison, the government argues, they were never officially exonerated (as was Limone) and thus plaintiffs may not bring claims arising from their prosecution. While this argument has the most legal heft of any that defendants proffer, it also is ultimately unavailing—not to mention, profoundly unfair.

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the

Supreme Court concluded that in order to recover damages under section 1983 based on allegations that tend to impugn the validity of a criminal conviction, a plaintiff must prove "favorable termination" of the criminal action against him. *See id.* at 486–87, 114 S.Ct. 2364. The Court reached this conclusion because the common law traditionally imposed a "favorable termination" requirement in malicious prosecution actions for sound providential reasons.[13] First, a favorable termination requirement "avoids parallel litigation over the issues of probable cause and guilt." *Id.* at 484, 114 S.Ct. 2364 (internal quotation marks and citation omitted). Specifically, it prevents "the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution," a result that contravenes "a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transactions." *Id.* Second, it prevents "collateral attack on the conviction through the vehicle of a civil suit," which is not an appropriate mechanism to challenge the validity of an *"outstanding* criminal judgment." *Id.* at 484–86, 114 S.Ct. 2364 (emphasis added).

These concerns, however, are irrelevant here. The Tameleo and Werner (Greco) plaintiffs plainly are not using this civil action as an end run around habeas corpus, the proper criminal law mechanism to challenge confinement pursuant to an invalid conviction. Moreover, since Tameleo and Greco are no longer imprisoned, plaintiffs argue, they are exempt from the favorable termination requirement under a later Supreme Court case, *Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), that limited the reach of *Heck.* Plaintiffs further suggest that ongoing government wrongdoing, which blocked their access to effective post-conviction remedies prior to their deaths, warrants an exemption to *Heck.* And finally, even if the "favorable termination" rule applies, the unique and shocking facts of this case are more than adequate to meet it.

In *Spencer,* the petitioner brought a habeas action challenging an order revoking his parole and returning him to prison to complete his original term of imprisonment. By the time the habeas case was ripe for decision before the trial court, Spencer already had completed the entire term of imprisonment. At that point, the lower court held, he no longer had standing to challenge the validity of the parole revocation order by way of a habeas corpus action. *See id.* at 6, 118 S.Ct. 978.

Spencer asserted that several collateral consequences of his parole revocation were sufficient to confer standing in his habeas action, including one relating to the rule in *Heck.* Spencer argued that if he were not permitted to demonstrate the invalidity of his parole revocation in the habeas action, the *Heck* "favorable termination" requirement would preclude him from bringing an action for damages. This "injury"—deprivation of a civil rights remedy—would confer standing. *See id.* at 17., 118 S.Ct. 978

---

**13.** Oddly, none of the parties squarely address whether "favorable termination" is, in fact, required for recovery under each of the specific Massachusetts torts invoked in this case. Formally, *Heck* and its progeny govern only the section 1983 and *Bivens* claims, although they are rooted generally in common law principles derived from malicious prosecution. While favorable termination is clearly an element of malicious prosecution under Massachusetts law, *see Gutierrez v. MBTA,* 437 Mass. 396, 405, 772 N.E.2d 552 (2002), I have seen no authority to suggest that this requirement attaches to other torts alleged here, such as intentional infliction of emotional distress, negligent supervision, and civil conspiracy. *Cf. id.* (noting specifically that "abuse of process" tort does not require favorable termination).

The Court rejected the petitioner's argument on the basis that deprivation of a section 1983 remedy is not an "injury" for standing purposes. *See id.* (explaining that petitioner's argument "is a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available"). In any event, the Court noted that *Heck* would pose no obstacle to a section 1983 action that challenged the constitutionality of parole revocation *procedures* (which was not Spencer's claim) without impugning the *outcome* of revocation itself. *See id.*

Four concurring justices, however, described a broader exception to *Heck*,[14] and their reasoning on that score was joined by a fifth in dissent.[15] They took seriously the possible loss of a section 1983 remedy. The rule suggested by five justices was that "a former prisoner, no longer 'in custody' may bring a § 1983 action challenging the unconstitutionality of a conviction or confinement" without meeting the favorable termination requirement where that requirement is "impossible, as a matter of law, for him to satisfy." *Id.* at 21, 118 S.Ct. 978.

The *Spencer* case dramatized the possibility that a former prisoner might lose the ability to bring a section 1983 action based on his underlying conviction merely because his sentence was relatively short.[16] This would produce an anomalous result: "a given claim for relief from unconstitutional injury would be placed beyond the scope of § 1983 if brought by a convict free of custody ... when exactly the same claim could be redressed if brought by a former prisoner who had succeeded in cutting his custody short through habeas." *Id.* at 19–21, 118 S.Ct. 978. To avoid such a result, five justices were willing to further disentangle section 1983 relief from substantive attacks on a conviction, suggesting that the former would still be available to a convict no longer imprisoned even if substantive challenges to the underlying conviction were not. The linchpin was practical—*Heck* would not apply where it is impossible as a matter of law for a plaintiff to meet the "favorable termination" rule.

While several Circuits have held that *Spencer* codified a refinement on the broad rule of *Heck, see, e.g., DeWalt v. Carter,* 224 F.3d 607, 616–17 (7th Cir.2000); *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir. 1999), the First Circuit appears to disagree. *See Figueroa v. Rivera,* 147 F.3d 77, 81 n. 3 (1st Cir.1998) (rejecting, despite *Spencer,* section 1983 claim of inmate's kin where inmate died while still in the process of challenging his conviction). While I obviously am bound by the First Circuit's holding in *Figueroa,* the court's reasoning is puzzling. Referring to the *Heck* discussion in *Spencer* as mere dicta, the *Figueroa* court explained: "The [Supreme] Court, however, has admonished the lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court the perogative of overruling its own decisions. We obey this admonition." *Figueroa,* 147 F.3d at 81 n. 3 (internal cita-

---

**14.** *See id.* at 19–21, 118 S.Ct. 978 (Souter J. concurring.) Justice Souter was joined by Justices Breyer, Ginsburg, and O'Connor.

**15.** *Id.* at 25 n. 8, 118 S.Ct. 978 (Stevens, J. dissenting).

**16.** While it is possible that a former prisoner, no longer in custody, may lose access to habe-

as relief, even the majority in *Spencer* suggested that he still may argue that the collateral consequences of his conviction are sufficient to convey standing to sue. *See Spencer,* 523 U.S. at 8, 118 S.Ct. 978. The problem in Spencer was that the petitioner had no quarrel with the underlying conviction, only with the allegedly wrongful termination of his parole. *See id.*

tions omitted). But adopting the *Spencer* discussion of "favorable termination" would *not overrule* or even *weaken Heck* but rather would merely refine and explain its application to a set of facts that was not before the *Heck* Court. *See DeWalt*, 224 F.3d at 617 n. 5 (adopting *Spencer* concurrence's application of *Heck;* "we rely on separate opinions not to overrule precedent, but to help guide us in deciding an open question."). And surely the *Heck* court could not have contemplated the shocking allegations here; that Tameleo and Greco could not have achieved a "favorable termination" of the proceedings against them precisely because the defendants conspired to keep the truth from them, improperly concealing evidence for decades.

I conclude that the plaintiffs may proceed with their claims for two reasons. First, government wrongdoing that effectively denied access to post-conviction remedies would excuse the failure to show favorable termination. Second, in the unique factual circumstances of this case, I find that Greco and Tameleo have satisfied the "favorable termination" requirement under a theory of constructive reversal. The reasoning behind the court decision vacating Limone's conviction and the *nolle prosequi* formally issued in favor of Limone apply in at least equal measure to them.

### 1. *Denial of Access to Post-Conviction Remedies*

 Even if favorable termination of proceedings against Greco and Tameleo

were not established, the failure would be excused in this case because the government is alleged to have actively and improperly concealed evidence that prevented Greco and Tameleo from even learning that they had viable claims over the course of several decades, when they were still in a position to challenge their convictions.

In *Hoard v. Reddy*, 175 F.3d 531 (7th Cir.1999), the plaintiff sought damages based on allegations that defendants were "hindering his efforts to litigate a state-court collateral attack on his conviction." *Id.* at 533. The court held that *Heck* barred the damages action because the plaintiff could have sought an injunction to "clear away the blockage" to the courts. The court also recognized, however, that a damages action could be appropriate if "the defendants' alleged violation of his right of access to the courts has forever barred him from pursuing his state postconviction remedy so that the only relief available to him is damages." *Id.*

In an unpublished opinion,[17] the First Circuit implicitly recognized the *Hoard* exception. In upholding dismissal of a civil rights action based on the *Heck* favorable termination requirement, the Court noted that there was "no suggestion [ ] of any 'illegal blocking [of] access to state post conviction remedies'" and the failure to seek favorable termination was "due to [the plaintiff's] own dereliction." *Forte v. Reilly*, No. 02–1217, 43 Fed. Appx. 395, 396 nn. 1 & 2, available at 2002 WL 1811685, at **1 nn. 1 & 2 (1st Cir. Aug.8, 2002) (per curiam).[18]

17. Amendments to Local Rule 32.2 of the First Circuit now permit parties to cite unpublished opinions.

18. The Werner plaintiffs (but not the Limone and Tameleo plaintiffs) also argue that there is a general fraud or perjury exception to the favorable termination requirement under Massachusetts law. However, the cases they cite stand for a different proposition entirely. In *Anderson v. Boston School Committee*, 105 F.3d 762 (1st Cir.1997), the court upheld dismissal of a malicious prosecution claim of a plaintiff who had been convicted in a bench trial but later acquitted by a jury. *See id.* at 765. Even though the plaintiff's criminal proceedings had favorably terminated in acquittal, his claim could not succeed because

Here, in contrast, the government blocked Greco's and Tameleo's effective access to post-conviction remedies by actively subverting their attempts to avail themselves of commutation procedures and by withholding critical evidence until years after they had died. The government should not be permitted to enjoy the fruits of its malfeasance by hiding behind *Heck*.

### 2. *Constructive Reversal*

 To fulfill the "favorable termination" requirement, plaintiffs specifically allege that criminal "proceedings were constructively terminated in favor of Tameleo and Greco inasmuch as the allegations and testimony against Tameleo and Greco were based upon the same evidence and witnesses as the case against Limone." In granting Limone's motion for a new trial, the Superior Court concluded that "the jury would likely have reached a dif-

ferent conclusion" based on previously undisclosed evidence for two reasons. *Commonwealth v. Limone*, Nos. 32367, 32369, 32370, available at 2001 WL 30494, *7 (Mass.Super.Jan.12, 2001). "First, the new evidence casts serious doubt on Barboza's credibility .... Barboza was a 'vital, principal prosecution witness at trial.' In effect 'the principal issue before the jury was one of Barboza's credibility.' " *Id.* (internal citations omitted). Second, "the new evidence reveals that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder." *Id.*

This reasoning would compel the same conclusion requiring reversal of the convictions against Tameleo and Greco. The only distinction is that Tameleo and Greco are now precluded as a matter of law from actually filing motions for new trials because they are deceased.[19]

---

the earlier conviction, as a matter of law, precluded a showing that the defendants lacked probable cause, which is *another* element of malicious prosecution in *addition* to favorable termination. *See id.* at 766 (citing *Della Jacova v. Widett*, 355 Mass. 266, 244 N.E.2d 580 (1969)). Absent proof that the original conviction was procured by perjury or fraud, the plaintiff could not meet his burden of proving lack of probable cause. *See id.* In other words, a conviction—even if later overturned—ordinarily is a complete bar to proof that defendants in a malicious prosecution action lacked probable cause. However, a plaintiff will, nevertheless, be permitted to proceed with his or her claim if he or she can show that the original conviction was procured by fraud or perjury. *See, e.g., Magaletta v. Millard*, 346 Mass. 591, 596, 195 N.E.2d 324 (1964) ("It is the general rule that conviction by the court to which the complaint was made is a bar to an action for malicious prosecution even though on appeal the jury may render a verdict of not guilty. An exception to that rule is established in instances where the conviction by the trial magistrate was obtained solely by false testimony of the defendant or is 'impeached on the ground of fraud, conspiracy or subornation in its pronouncement.' ") (quoting *Broussard v. Great*

*Atlantic & Pacific Tea Co.*, 324 Mass. 323, 326, 86 N.E.2d 439 (1949)); *see also Ramos v. Gallo*, 596 F.Supp. 833, 840 (D.Mass.1984). While this fraud/perjury exception thus may make it easier to prove the "lack of probable cause" element of malicious prosecution, it has no bearing on the "favorable termination" element.

**19.** The government argues that it would be inappropriate to draw any conclusions about Greco and Tameleo's innocence, citing the language of the *nolle prosequi* of co-defendant Roy French. French's *nolle prosequi*, in contrast to that of Limone, maintains that "French was a direct participant in Deegan's murder." The comparison of Greco and Tameleo to French is inappropriate. Everyone apparently agrees that French actually was involved in the murder, while the government does not remotely suggest the same of Greco or Tameleo. In any event, the key building block of the constructive favorable termination argument is that the Superior Court's analysis in vacating the conviction of Limone would apply with at least equal force to Greco and Tameleo. This argument does not rely at all on a prediction of what the Commonwealth might or might not have said in a *nolle prosequi* for Greco or Tameleo.

There is at least some express authority in this circuit to support the notion of constructive reversal. The district court's opinion in *Figueroa* suggested that if a petitioner successfully overturned his conviction, kin of a deceased co-defendant potentially would also clear *Heck's* favorable termination requirement and could bring a section 1983 action of their own. *See Figueroa Echevarria v. Rivera Garcia*, 977 F.Supp. 112, 116 (D.P.R.1997); *cf. Commonwealth v. McCarthy*, 348 Mass. 7, 14, 200 N.E.2d 264 (1964) (holding that justice required overturning defendant's conviction where co-defendants had successfully appealed). While the First Circuit expressed some skepticism of a "reversal by proxy" theory, it did not expressly decide the issue. *Figueroa*, 147 F.3d at 81. In any case, I am persuaded that the unique and shocking facts of this case, combined with the clear applicability of the judicial findings in *Limone* to Greco and Tameleo, make it an archetypal instance where reversal by proxy is warranted.

### E. *Intentional Infliction of Emotional Distress*

The government contends that the intentional infliction of emotional distress claim arises from the same facts as other claims that are jurisdictionally barred (based on the other arguments the government advances). The plaintiffs cannot circumvent those jurisdictional bars, the government contends, by seeking recovery for the same conduct "recharacterized" under the theory of intentional infliction of emotional distress. *See, e.g., Metz v. United States*, 788 F.2d 1528, 1535 (11th Cir.1986) (holding that intentional infliction of emotional distress claims are barred where they "arose out of" conduct covered by an FTCA exception). Defendants counter persuasively that they are not merely "artfully pleading" intentional infliction of emotional distress to bring claims that are otherwise barred.

First, the facts alleged clearly make out a case under state law for a number of distinct torts that *are* actionable under the FTCA, including malicious prosecution and intentional infliction of emotional distress. The plaintiffs are not simply trying to "end run" FTCA exceptions to bring claims that otherwise are barred. Second, the First Circuit has expressly rejected the government's reasoning, which is based on cases from other circuits such as *Metz*. In *Santiago–Ramirez v. Secretary of Dept. of Defense*, 984 F.2d 16 (1st Cir.1993), the court explained:

> There is no exception in section 2680 which disallows a claim for the infliction of emotional distress by government agents. Claims against the government for intentional infliction of emotional distress are not excepted from the FTCA. Nor has such an exception been read into the statute. The Supreme Court has taken a very strict approach to the reading of section 2680.... Therefore, although [a] claim for intentional infliction of emotional distress may overlap with a claim for false imprisonment, which is excepted, it does not follow that the first claim is also excepted.

*Id.* at 20–21.

The government insists that *Santiago–Ramirez* is "inapposite" because malicious prosecution is the real "gravamen" of the plaintiffs' claims in this case. This purported distinction lacks substance and the government's self-serving assessment of "gravamen" is arbitrary in any event.

There can be little doubt that the acts of law enforcement personnel who framed innocent men for murder give rise to a claim of intentional infliction of emotional distress under Massachusetts law. One can infer from the complaints that the defendants "intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result" of

their conduct, which was "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community" and would result in emotional distress so "severe and of such a nature that no reasonable person could be expected to endure it." *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466, 681 N.E.2d 1189 (1997).

### F. False Statements Regarding Commutation Petitions

■ The government argues that false statements made by FBI agents to the Massachusetts Advisory Board of Pardons are not actionable because they constitute libel and slander, torts for which there is no waiver of sovereign immunity under the FTCA. *See* 28 U.S.C. § 2680(h).

Plaintiffs counter persuasively that these false statements are just a small component of their broader claim for malicious prosecution, which *is* a distinct tort. Indeed, it is difficult to imagine that a malicious prosecution would not entail some false, slanderous and defamatory statements about a wrongfully accused defendant. It thus cannot follow that acts of defamation preclude liability for plaintiffs' other claims. *See Block v. Neal,* 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) ("[T]he partial overlap between [ ] two tort actions does not support the conclusion that if one is excepted under the Tort Claims Act, the other must be as well."); *see also Santiago–Ramirez,* 984 F.2d at 20–21 (holding that claim for intentional infliction of emotional distress is actionable under the FTCA even though factual allegations might also have supported claim for false imprisonment or false arrest).

Here, in other words, plaintiffs do not allege these false statements as a separate cause of action but rather as evidence of continuing wrongful conduct by the government that is actionable. Plain-

tiffs allege that the defendants initiated and consummated a bad faith prosecution and later interfered with post-conviction proceedings and commutation petitions by various means including, but not limited to, making false statements. The government's narrow focus on the false statements in isolation again seems to seek dismissal of *facts* rather than *claims,* which Rule 12 does not contemplate.

### G. Common Law Conspiracy

The government argues that the conspiracy claim must be dismissed because the common law torts that were the objects of the conspiracy are not actionable. *See, e.g., Downie v. City of Middleburg Hts.,* 76 F.Supp.2d 794, 800 (N.D.Ohio 1999) (concluding that conspiracy claim must fail where underlying defamation and contract claims are barred). This argument must be rejected because, as explained above, I have determined that the underlying tort claims are not subject to dismissal.

■ The government also contends that it cannot be held liable for the tortious conduct of persons who are not federal employees. This argument also misses the mark. While it is true that the tort of conspiracy imposes liability on "one individual for the tort of another," *Grant v. John Hancock Mut. Life Ins. Co.,* 183 F.Supp.2d 344, 363 (D.Mass.2002), the government offers no authority to suggest that the tort of conspiracy is thereby wholly excepted from the FTCA. The government's FTCA liability for conspiracy is grounded in the *conspiratorial conduct of federal employees,* even though certain other actions in furtherance of the conspiracy may have been taken by other people. Moreover, the plaintiffs have alleged sufficient facts to establish a conspiracy *among* federal employees (*i.e.,* Rico, Condon, Handley, Morris, and Connolly). It also is

premature to assess at this stage of the litigation just how much "control" that the government may have had over other participants in the conspiracy such as Flemmi, Barboza, and various state officers. It is entirely possible that plaintiffs will be able to prove that any number of additional people were functionally agents of the government for FTCA purposes. *See Logue v. United States,* 412 U.S. 521, 526–32, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973) (outlining "control" test).

## IV. *INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS*

Individual defendants Condon, Rico, and Walsh joined in many of the government's arguments, which I have handled above. In addition, they raise several putative grounds for dismissal of their own, which I treat in turn below.

### A. *State Law Claims*

Condon and Rico argue that state common law claims against them are precluded by the FTCA. Under the Westfall Act, the Attorney General may certify that a federal employee was acting within the scope of his/her employment at the time of an incident that serves as the basis for a common law tort claim against the employee. *See* 28 U.S.C. § 2679(d)(1); *Lyons v. Brown,* 158 F.3d 605, 606 (1st Cir.1998). If the employee is certified, then he or she is immune from common law tort claims arising from certified conduct and the United States is substituted for those claims. *Id.* at 606–607. Here, the government filed a certification of defendants Condon, Rico, and Handley.

Plaintiffs do not dispute the defendants' position. Indeed they did not oppose a government motion to substitute the United States as defendant on all such counts, which I previously granted, dismissing state law claims against Rico, Condon, and Handley.

### B. *Qualified Immunity*

Defendants Condon, Rico, and Walsh argue that they are entitled to qualified immunity, which shields government officials "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Here, the defendants argue their actions should be immunized because the exculpatory evidence disclosure obligations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), have only recently come to apply to investigators, as opposed to prosecutors. *See, e.g., Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) (citing cases from 1996 and later for the proposition that a police officer "sometimes may be liable if he fails to appraise the prosecutor or a judicial officer of known exculpatory information."). Back in 1967, the defendants suggest, there was no clearly established duty to turn over exculpatory evidence to the defense.

The defendants' argument draws the issue much too narrowly. As early as 1935, the Supreme Court expressly held that "depriving a defendant of liberty through a deliberate deception of the court and jury by the presentation of testimony known to be perjured" violates the Constitution. *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *see also Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942) ("allegations that [petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him ... sufficiently charge a deprivation of rights guaranteed by the Federal Constitution"). It is, in a word, ridiculous to suggest that, at any time in this nation's

history, a reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit. While it may be true that the defendants could be entitled to qualified immunity for a narrow claim that they violated *Brady* in 1967, the allegations here are much broader. It would make little sense to strike individual allegations of non-disclosure since they are an integral part of the overall story. Moreover, this case is not just about events in 1967 but the continuing efforts, in ensuing years, to cover up the wrongs done to Limone, Greco, and Tameleo.

Put another way, the qualified immunity issue as it is raised by the defendants does not require me to resolve any *legal* dispute about the contours of relevant "clearly established law." Rather, I am denying the motions to dismiss on qualified immunity grounds because the defendants' argument is based on nothing more than a shriveled caricature of the *facts* that plaintiffs have alleged and the reasonable inferences that may be drawn from them. Perhaps, after discovery, the facts that are developed may permit the defendants to raise qualified immunity in a more substantial way in motions for summary judgment. At this point in the litigation, however, the defendants' position is frivolous.[20]

### C. *Absolute Immunity*

▉ The individual defendants argue that they have absolute immunity for their own allegedly false testimony under *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), where the Supreme Court held that police officers were immune from civil liability for having given perjured testimony. They also argue that *Briscoe* confers immunity for suborning perjury or conspiring to give false testimony.

This argument lacks traction. The plaintiffs do not allege that the defendants themselves committed perjury at the trial or conspired to commit perjury with Barboza or anyone else. In that sense, the plaintiffs neither seek to impose liability for the defendants' testimony, which would be barred by *Briscoe*, nor to make an end run around *Briscoe* with conspiracy allegations. Rather, here again, plaintiffs allege that the defendants engaged in a variety of actions, only some of which were directly tied to immunized trial testimony, that violated the constitutional rights of Limone, Greco, and Tameleo.[21] The defendants

---

**20.** In a filing regarding the discovery schedule [document # 146], the individual defendants have indicated that they are likely to seek an interlocutory appeal of a denial of qualified immunity under the "collateral order" doctrine on the authority of *Hegarty v. Somerset County*, 25 F.3d 17 (1st Cir.1994) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). In my view, there is no basis for such an appeal. First, *Hegarty* and *Mitchell* involved appeals from denial of summary judgment on the basis of a much more substantial record than is presently available in this case. Second, the Supreme Court later clarified that under *Mitchell*, appeal only lies with regard to a pure "legal issue," *Mitchell*, 472 U.S. at 530 n. 10, 105 S.Ct. 2806, which is not the basis for my decision here. "Where adjudication of the immunity defense requires the district court to determine 'the existence, or nonexis-

tence, of a triable issue of fact' ... 'the denial of qualified immunity is not sufficiently separate from the merits' so as to be appealable." *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 268 n. 3 (2d Cir.1999) (quoting *Johnson v. Jones*, 515 U.S. 304, 316–18, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).

**21.** There is admittedly some ambiguity in court decision on the scope of *Briscoe* immunity; specifically, whether a law enforcement officer enjoys absolute immunity for suborning perjury. *Compare Young v. Biggers*, 938 F.2d 565, 569 (5th Cir.1991) (rejecting absolute immunity for two police officers charged with persuading witness to testify falsely) *with Jones v. Cannon*, 174 F.3d 1271, 1288–89 (11th Cir.1999) (holding that detective enjoyed absolute immunity for procuring false testimony at trial).

spent years fabricating a case against Greco, Limone, and Tameleo and then, after the trial, spent decades covering their tracks and ensuring that the trio remained incarcerated. Nothing in the *Briscoe* line of cases suggests that such activities are covered by the umbrella of immunity conferred upon trial testimony.

While the First Circuit has not taken a firm position on *Briscoe's* scope, Judge Saris of this Court offered a very persuasive analysis in *Mitchell* that defeats the defendants' arguments here:

> [A] plaintiff cannot use a conspiracy claim to short-circuit *Briscoe's* grant of absolute immunity to testifying witnesses. However, as several courts including the First Circuit have noted, a defendant cannot use *Briscoe's* rule of absolute immunity as a shield to protect a whole course of conduct merely because, at some point, the defendant was linked to testimony given in a judicial proceeding.

*Mitchell,* 130 F.Supp.2d at 211–12 (citing, *inter alia, Guzman–Rivera v. Rivera–Cruz,* 55 F.3d 26, 29 (1st Cir.1995) (stating that the immunized nature of an act "does not spread backwards like an inkblot, immunizing everything it touches.")).

### D. *Specificity of Pleadings*

■ Defendants Condon, Rico, and Walsh argue that the complaints do not allege sufficient "specific facts" against them to support plaintiffs' claims, particularly where defendants have invoked a qualified immunity defense. The defendants rely principally on *Judge v. Lowell,* 160 F.3d 67 (1st Cir.1998), in which the First Circuit held that a heightened pleading standard applies in cases where the cause of action requires proof of improper motive, such as racial discrimination or equal protection claims. *See id.* at 74 n. 9. This argument is unconvincing.

First, plaintiffs' allegations in this case do not require a showing of improper mo-tive. Framing innocent men for murder is unconstitutional irrespective of whatever invidious motives may have animated the defendants' actions. The assertion of a qualified immunity defense does not in itself trigger higher pleading standards. *See id.* ("[T]he key factor permitting the requirement that facts, not merely a conclusion, be pleaded, was the existence of 'a claim that requires proof of a wrongful motive,' not an immunity defense as such.").

Second, the Supreme Court unanimously rejected heightened pleading standards in *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which post-dates *Judge.* The Court explained that "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake. This Court, however, has declined to extend such exceptions to other contexts." *Id.* at 513, 122 S.Ct. 992; *see also Gorski v. N.H. Dep't of Corrections,* 290 F.3d 466, 473–74 (1st Cir.2002) (vacating dismissal for pleading deficiency based on *Swierkiewicz* ); *Greenier v. Pace,* 201 F.Supp.2d 172, 177 (D.Me.2002) (recognizing the *Swierkiewicz* abrogated *Judge* ).

■ Third, whatever pleading standard one applies, the plaintiffs' specific allegations against Rico, Condon, and Walsh are plainly sufficient. Rico and Condon are alleged to have been the key players in cultivating Barboza, procuring and enabling the prosecution of Limone, Greco, and Tameleo, and covering up the government's malfeasance in ensuing decades. Walsh is alleged to have been privy to much of the FBI's activity and specifically to have suppressed alibi evidence from Florida. Moreover, it would be especially inappropriate to dismiss individual defendants on technical pleading grounds prior

to discovery in this case, which is based in large part upon the defendants' alleged suppression of evidence for decades. Dismissing these defendants would potentially allow them to benefit from the very misconduct that is challenged. In short, the allegations are more than sufficiently specific to allow the case to proceed at this stage of the litigation.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motions to Dismiss [documents ## 70, 73, 75, 78, 110, 113, and 116] are all **DENIED**.

**SO ORDERED.**