# United States Court of Appeals
## For the First Circuit

No. 03-2130
    03-2212

PETER J. LIMONE ET AL.,

Plaintiffs, Appellees,

v.

DENNIS CONDON ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya, Circuit Judge,

Gibson,[*] Senior Circuit Judge,

and Howard, Circuit Judge.

John M. Connolly, with whom Michael B. Meyer and Meyer, Connolly, Sloman & MacDonald LLP were on brief, for appellant Condon.
James M. Chernetsky, Assistant Corporation Counsel, City of Boston, with whom Thomas R. Donohue, Assistant Corporation Counsel, was on brief, for appellant Walsh.
Michael Avery, with whom Juliane Balliro, Ronald J. Snyder, and Perkins, Smith & Cohen, LLP were on consolidated brief, for appellees Limone and Tameleo et al.

_____

[*]The Honorable John R. Gibson, of the Eighth Circuit, sitting by designation.

John Foskett, with whom Richard D. Bickelman, Lawrence R. Holland, and Deutsch Williams Brooks Derensis & Holland, P.C. were on brief, for appellees Werner (Executrix of the Estate of Louis Greco) et al.

————————————

June 10, 2004

————————————

**SELYA**, **Circuit Judge**.  These interlocutory appeals follow the entry of an order denying motions to dismiss based on qualified immunity.  See Limone v. United States, 271 F. Supp. 2d 345, 349 (D. Mass. 2003).  The appellants exhort us to reverse that decree or, alternatively, to exercise pendent appellate jurisdiction over another (potentially dispositive) issue.  We conclude that at this stage of the proceedings (i) the district court appropriately rejected the appellants' qualified immunity defenses, and (ii) the scope of these interlocutory appeals should not be broadened to encompass an unrelated issue.  Consequently, we affirm the denial of qualified immunity and remand for further development of the facts.

## I.  BACKGROUND

These appeals arise out of two separate but closely related suits, consolidated in the district court.  An explication of the underlying facts requires the juridical equivalent of an archeological dig.  The relevant events date back almost four decades to the 1965 murder of Edward "Teddy" Deegan and the 1968 convictions of several individuals, including Peter Limone, Louis Greco, and Henry Tameleo, for that slaying.  Notwithstanding the jury's verdict and the subsequent rejection of their direct appeals, see Commonwealth v. French, 259 N.E.2d 195 (Mass. 1970), the three men steadfastly maintained their innocence and mounted a campaign to clear their names.  The facts, as now revealed,

-3-

seemingly support their claims of innocence.  The instant actions seek damages against those allegedly responsible for their wrongful convictions.

For present purposes, the operative pleadings are the two amended complaints.[1]  Those complaints are separate but similar. We compile the following account of the facts by reading the amended complaints in tandem, drawing all reasonable inferences therefrom in the light most agreeable to the plaintiffs (as the parties opposing the motions to dismiss).  We note, however, that the district court recounted the factual allegations set out in the amended complaints at some length, see Limone, 271 F. Supp. 2d at 349-53, and we urge those who hunger for greater detail to consult that rescript.

The plaintiffs — Limone (the only surviving member of the trio), the estates of Greco and Tameleo, and various relatives asserting derivative claims — have sued both a quondam agent of the Federal Bureau of Investigation (FBI) and a retired Boston police officer.[2]  The amended complaints allege that the former FBI agent,

---

[1]There are two suits rather than three because Limone and Tameleo's heirs and personal representatives joined in the filing of a single action.  Greco's executrix and heirs chose to sue separately.

[2]The plaintiffs actually sought damages against several other parties as well, asserting a salmagundi of federal and state-law theories.  See Limone, 271 F. Supp. 2d at 348 n.3 (identifying the defendants and delineating the claims).  One such party, former FBI agent H. Paul Rico, died on January 16, 2004.  When no personal representative came forward on his behalf, we dismissed his pending

-4-

Dennis Condon, and the former Boston detective, Frank L. Walsh, framed Limone, Greco, and Tameleo, assisted the Commonwealth of Massachusetts in wrongly convicting them on a charge of first-degree murder, participated in a coverup, and allowed the three innocent men to languish in prison for years.[3]  In relevant part, the complaints assert <u>Bivens</u> claims against Condon, <u>see</u> <u>Bivens</u> v. <u>Six Unknown Named Agents of the FBN</u>, 403 U.S. 388, 397 (1971), and section 1983 claims against Walsh, <u>see</u> 42 U.S.C. § 1983 (2000). The central theme of these claims is the accusation that Condon and Walsh, inter alios, violated the Constitution by developing one Joseph "Baron" Barboza as a witness for the prosecution in spite of their knowledge that Barboza would perjure himself and falsely implicate three innocent men in Deegan's murder.

Condon and Walsh (appellants here) moved to dismiss both amended complaints based on the doctrine of qualified immunity. They simultaneously moved to dismiss the suits brought on behalf of Greco and Tameleo on the ground that those plaintiffs had failed to satisfy the favorable termination requirement (described <u>infra</u> Part III) laid down by the Supreme Court in <u>Heck</u> v. <u>Humphrey</u>, 512 U.S.

---

appeal without prejudice.  The other defendants are not parties to these interlocutory appeals.

[3]Although a Massachusetts state court judge originally sentenced the trio to death, the United States Supreme Court subsequently vacated that disposition.  <u>See</u>, <u>e.g.</u>, <u>Limone</u> v. <u>Massachusetts</u>, 408 U.S. 936 (1972).  Eventually, all the sentences were commuted to life imprisonment.

477, 486-87 (1994). The district court rebuffed these initiatives. As to qualified immunity, the court found it inconceivable that, at the time of the relevant events, "a reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." Limone, 271 F. Supp. 2d at 365-66. As to Heck, the court found the favorable termination requirement satisfied vis-à-vis the Greco and Tameleo plaintiffs on a theory of constructive reversal and, alternatively, on a theory of estoppel. Id. at 361. These timely appeals ensued.

## II. THE QUALIFIED IMMUNITY DEFENSE

Condon and Walsh have appealed from the district court's order denying their motions to dismiss based on qualified immunity. An interlocutory appeal lies from such an order where, as here, qualified immunity turns on abstract legal questions. Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995). We review the district court's order de novo, directing dismissal of the complaints "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

We begin with first principles. Qualified immunity is a judge-made doctrine. The elementary justification for the doctrine is that public officials performing discretionary functions should be free to act without fear of retributive suits for damages except when they should have understood that particular conduct was

-6-

unlawful. Davis v. Scherer, 468 U.S. 183, 195 (1984). That awareness depends, in large part, on the extent to which legal rules were clearly established when the official acted. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It follows that an inquiry into the reasonableness of an officer's conduct must focus both on what the officer did (or failed to do) and on the state of the law at the time of the alleged act or omission. Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003) (en banc), cert. denied, 124 S. Ct. 1074 (2004); Iacobucci v. Boulter, 193 F.3d 14, 21 (1st Cir. 1999). In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken. Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Although these appeals involve claims based on two different legal theories — Bivens and section 1983 — the analytical framework is, for our purposes, identical. See Wilson v. Layne, 526 U.S. 603, 609 (1999). Drawing on Supreme Court precedent, see, e.g., Saucier v. Katz, 533 U.S. 194, 200-02 (2001), we have developed a three-part algorithm for assessing whether a federal or state actor is entitled to qualified immunity. We consider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated

similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right. Savard, 338 F.3d at 27. More often than not, proper development of the law of qualified immunity is advanced if courts treat these three questions sequentially. See Saucier, 533 U.S. at 201; Fabiano v. Hopkins, 352 F.3d 447, 453 (1st Cir. 2003).

**A**

The threshold question in a qualified immunity appeal centers on the current state of the law. On a motion to dismiss, this question asks whether the facts alleged, viewed in the light most favorable to the complaining party, show that the officer's conduct violated some constitutional right. Siegert v. Gilley, 500 U.S. 226, 232-33 (1991); Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003). We turn directly to that question.

The amended complaints paint a sordid picture. Although the misdeeds described therein are many and varied, the plaintiffs' claims may be distilled into two basic allegations: first, that the appellants purposefully suborned false testimony from a key witness; and second, that the appellants suppressed exculpatory evidence in an effort both to cover up their own malefactions and to shield the actual murderers (one of whom was being groomed as an FBI informant). The complaints weave these allegations together. From that platform, the plaintiffs asseverate that an individual's

right not to be convicted by these tawdry means — his right not to be framed by the government — is beyond doubt.

This is easy pickings. Although constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. See, e.g., Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction). Thus, we resist the temptation to expound needlessly upon the first element in the qualified immunity catechism and simply pronounce that requirement satisfied.

**B**

The second question in the algorithm asks whether the state of the law at the time of the putative violation afforded the defendant fair warning that his or her conduct was unconstitutional. See Hope v. Pelzer, 536 U.S. 730, 741 (2002). In the circumstances of this case, that question requires us to determine whether the right not to be framed by law enforcement agents was clearly established in 1967 — the year in which the

-9-

appellants are alleged to have started twisting their investigation to target the plaintiffs. We think that it was.

From a jurisprudential perspective, our delving goes back some seventy years. In <u>Mooney</u> v. <u>Holohan</u>, 294 U.S. 103 (1935) (per curiam), the Supreme Court explained that due process

> is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.

<u>Id.</u> at 112. The following term, the Court reaffirmed that the Due Process Clause forbids convictions predicated on deliberate deceptions. <u>See</u> <u>Brown</u> v. <u>Mississippi</u>, 297 U.S. 278, 286 (1936). Six years later, the Court needed only a single paragraph and a citation to <u>Mooney</u> to buttress its conclusion that "allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution." <u>Pyle</u> v. <u>Kansas</u>, 317 U.S. 213, 216 (1942). Given these precedents, it is not surprising that, as early as 1951, this court described <u>Mooney</u>'s core premise as "well-settled." <u>Coggins</u> v. <u>O'Brien</u>, 188 F.2d 130, 138 (1st Cir. 1951).

-10-

In 1959, the Supreme Court confirmed that the Mooney right covered circumstances in which "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269 (1959). In raising the bar to this modest level, the Court recognized that its prior case law "established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Id. (citing Mooney). The Court viewed such a right as "implicit in any concept of ordered liberty." Id. And in 1967 — the very year that the violations in the instant case are alleged to have begun — Justice Stewart, writing for a unanimous Court, reiterated the point:

> More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle.

Miller v. Pate, 386 U.S. 1, 7 (1967) (citations omitted).

The appellants resist this impressive array of authority on two fronts. First, they accuse the plaintiffs and the district court of having defined the right in question too broadly. In their view, modeling the right as a right to be free from a contrived conviction — a right not to be framed by the government — casts too wide a net. They suggest instead that the plaintiffs' allegations should be squeezed into a more circumscribed mold and read as setting forth a Brady violation. See Brady v. Maryland,

373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"). Having erected this straw man, the appellants then shred it: although Brady was decided prior to 1967, they assert that it was not clearly established then (indeed, it may not be clearly established today) that the duties imposed by Brady apply to law enforcement officers under circumstances in which the prosecutor is unaware of the contrivance. See, e.g., Brady v. Dill, 187 F.3d 104, 114 (1st Cir. 1999) (suggesting that a law enforcement officer "sometimes may be liable" for a failure to reveal "known exculpatory information") (emphasis supplied); Reid v. Simmons, 163 F. Supp. 2d 81, 84 (D.N.H. 2001) (describing "the circumstances under which police officers may be held civilly liable for Brady violations" as "a matter of considerable uncertainty"), aff'd, 47 Fed. Appx. 5 (1st Cir. 2002) (per curiam), cert. denied, 124 S. Ct. 237 (2003).

It is certainly true that the manner in which a right is defined can make or break a qualified immunity defense. Courts must be careful not to permit an artful pleader to convert the doctrine of qualified immunity into a hollow safeguard simply by alleging a violation of an exceedingly nebulous right. See Wilson, 526 U.S. at 614-15; Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001). Courts must be equally

-12-

careful, however, not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability.

Here, the amended complaints, fairly read, are not susceptible to the appellants' animadversions. The right defined by the plaintiffs and recognized by the district court does not even approach the level of generality thought to be impermissible. See, e.g., Anderson, 483 U.S. at 639 (discussing what level of generality is permissible with respect to due process violations); Hatch, 274 F.3d at 20 (same, with respect to "the right to familial integrity" and "the parental interest in the care, custody, and control of children").

The appellants' argument has an even deeper flaw: it rests on a self-serving mischaracterization of the factual allegations set out in the amended complaints. The plaintiffs have not pleaded a separate claim that their rights were violated merely by the appellants' failure to divulge some discrete piece of Brady evidence. Rather, they have eschewed such a course in favor of a more sweeping accusation that the appellants actively participated in a plot to secure and sustain unjust convictions against innocent men. Though this scheme includes suballegations that occasionally involve Brady violations (e.g., suppression of exculpatory information), the overall charge cannot be shoehorned into the relatively narrow confines of the Brady rubric. As the district

-13-

court put it, the "individual allegations of non-disclosure" are not meant to be self-sustaining, but, rather, "are an integral part of the overall story."  Limone, 271 F. Supp. 2d at 366.

We have said before that "[t]he sum of an evidentiary presentation may well be greater than its constituent parts."  N. Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 470 (1st Cir. 1988) (quoting Bourjaily v. United States, 483 U.S. 171, 180 (1987)).  That aphorism is pertinent here.  Taken as a whole, the unsavory enterprise chronicled in the amended complaints is too multifaceted to fit within the integument of the Brady right.  In contrast, it fits comfortably within the more expansive contours of the right described in Mooney.  To restrict the plaintiffs to a Brady claim would require us to disregard the forest and focus single-mindedly on a particular tree.  The qualified immunity doctrine does not compel courts to take so myopic a view.

The appellants next attempt to tackle Mooney head-on. Even if Mooney furnishes the appropriate benchmark, this thesis runs, the circumstances in Mooney and its pre-1967 progeny are materially distinguishable from those alleged by the plaintiffs. According to the appellants, these were cases in which the falsity of the testimony was uncontroverted — not cases in which public officials simply pressed a view of the facts which, though ultimately proven wrong, was not obviously contrived.  In a modest variation on this theme, the appellants add that, as of 1967, there

was no clearly established right to be free from conviction based on testimony known only by law enforcement officers (and not by the prosecuting attorney) to be false.

We find these contentions unconvincing. The first, which at bottom challenges the sufficiency of the pleadings, is easily defeated. These appeals were brought following a decision on motions to dismiss under Fed. R. Civ. P. 12(b)(6), and, as such, all that is required is that the amended complaints allege acts sufficient to constitute framing and knowledge on the part of the appellants. See Educadores Puertorriqueños en Acción v. Rey Hernández, ___ F.3d ___, ___ (1st Cir. 2004) [No. 03-1588, slip op. at 12] (rejecting a heightened pleading standard for civil rights cases). While the plaintiffs eventually will have to adduce adequate evidence to support the claim that Condon and Walsh knew Barboza's story was apocryphal, their bare allegations of knowledge suffice at this embryonic stage of the proceedings. See id.

The appellants' second contention fares no better. Although the amended complaints do not allege guilty knowledge on the part of the prosecuting attorney, no such averment is necessary to state an actionable claim. The duty that Mooney and its pre-1967 progeny established — a duty to refrain from procuring convictions by the presentation of testimony known to be perjurious — extended in 1967, as now, to law enforcement officers generally. The Supreme Court ascribed this duty broadly to the sovereign and

-15-

its agents. See, e.g., Napue, 360 U.S. at 269 (attributing the duty to "representatives of the State"); Pyle, 317 U.S. at 216 (attributing the duty to "State authorities"); Mooney, 294 U.S. at 112 (attributing the duty to "the State"). It strains credulity to suggest that FBI agents and police officers, duly sworn to uphold the law, do not fall within the compass of these proscriptions.

We are not the first court to reach this conclusion. Citing Pyle, the Fifth Circuit ruled to this effect in 1969. See Smith v. Florida, 410 F.2d 1349, 1350-51 (5th Cir. 1969) (explaining that police violate the right described in Mooney if they suborn perjury even though they do so without the prosecutor's knowledge). Even more telling, the Third Circuit concluded in 1958 — nine years before Condon and Walsh are alleged to have embarked on their nefarious course of conduct — that Pyle had settled this very issue. See Curran v. Delaware, 259 F.2d 707, 713 (3d Cir. 1958). An examination of the Pyle record disclosed to the Third Circuit's satisfaction "that the prosecuting officer was in no wise a party to or cognizant of the perjured testimony given by certain witnesses of the State of Kansas or of the fact that the law enforcement officers had taken steps to procure false testimony favorable to the prosecution." Id. Although the prosecutor had been kept in the dark, the Pyle Court determined that the allegations, if true, would abridge the right described in Mooney. See Pyle, 317 U.S. at 216; see also Curran, 259 F.2d at 713

-16-

(relying on Pyle, reaching the identical conclusion, and finding such a violation).  We agree with this interpretation of Pyle and, thus, reject the appellants' argument that the prosecutor's complicity was a sine qua non of a Mooney claim in 1967.

Nor does the plaintiffs' inability to identify a pre-1967 scenario that precisely mirrors the scandalous facts of this case ensure the success of the appellants' claims of qualified immunity. There is no requirement that the facts of previous cases be materially similar to the facts sub judice in order to trump a qualified immunity defense.  Hope, 536 U.S. at 739-41; Hall v. Ochs, 817 F.2d 920, 925 (1st Cir. 1987).  General statements of the law are capable of conveying fair warning.  See United States v. Lanier, 520 U.S. 259, 270-71 (1997); Davis v. Rennie, 264 F.3d 86, 114 (1st Cir. 2001), cert. denied, 535 U.S. 1053 (2002).  It follows logically that, in some situations, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." Lanier, 520 U.S. at 271.  So it is here.

That ends this phase of our archival journey into the annals of constitutional jurisprudence.  We conclude, without serious question, that Mooney and its pre-1967 progeny provided reasonable law enforcement officers fair warning that framing innocent persons would violate the constitutional rights of the falsely accused.

**C**

Since the relevant right and rule were clearly established and the contours of the right were sufficiently well-defined at the critical time (1967), we must proceed to the third and final step in the qualified immunity pavane. This part of the inquiry considers whether it would have been clear to an objectively reasonable official, situated similarly to a particular appellant, that the actions taken or omitted contravened the clearly established right. See Saucier, 533 U.S. at 202; Hatch, 274 F.3d at 20; see also Anderson, 483 U.S. at 639 (emphasizing that the standard is an objective one). While the first two parts of the inquiry deal with abstract legal rules, the final step depends on the facts of a given case. Hatch, 274 F.3d at 24.

On an appeal from an order denying a motion to dismiss — a situation in which the court of appeals is required to credit the allegations of the complaint — the first two steps will frequently go a long way toward resolving the third. This case aptly illustrates that point. Given the facts that are set out in the amended complaints, we have scant difficulty in concluding that it should have been transparently clear to a reasonable officer situated similarly to either Condon or Walsh that his actions violated the constitutional rights of Limone, Greco, and Tameleo.

We start with Condon. Both complaints allege that Condon was reliably informed that Deegan had been executed by a crew that

-18-

included Joseph Barboza, Vincent Flemmi, Roy French, Ronald Cassesso, and Joseph Martin; that he knew, based on conversations with Barboza, that Barboza would commit perjury by swearing not only that Flemmi had no involvement in the murder but also that three innocent men (Limone, Greco, and Tameleo) had helped to perpetrate the crime; that he nonetheless developed Barboza as a witness and turned him over to the Suffolk County district attorney, knowing that Barboza's false testimony would be used to prosecute Limone, Greco, and Tameleo for a crime they did not commit; that he failed to disclose exculpatory evidence before, during, and after the trial; and that he interceded on Barboza's behalf in a subsequent murder prosecution with a view toward ensuring Barboza's continued silence and covering up his own misdeeds. It is plain beyond hope of contradiction that a reasonable officer, confronted with the same circumstances, would have understood that this behavior infracted the plaintiffs' constitutional rights.

To be sure, Condon argues that he deserves qualified immunity in spite of these allegations because the amended complaints describe vital reports as having been received by another FBI agent (H. Paul Rico) and/or by the FBI's Boston office — not by Condon personally. We do not think that this is an entirely fair characterization of the amended complaints. Even if it were, the plaintiffs, on a Rule 12(b)(6) motion, are entitled to

-19-

have all plausible inferences drawn in their favor. See Educadores, ___ F.3d at ___ [slip op. at 2]; LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998). The amended complaints reveal that Condon was stationed at the FBI's Boston office, that Rico was his partner, and that both were members of the joint federal-state task force assembled to investigate the murder. These facts support a plausible inference that the two shared the reports pertaining to the investigation.

The factual allegations anent Walsh are similar, although not identical, to those involving Condon. Both complaints allege that Walsh knew, based in part on inconsistent statements that he took from Barboza, that Barboza would falsely attest that Limone, Greco, and Tameleo murdered Deegan; that he nonetheless participated in the development of Barboza as a witness with respect to the prosecution of the plaintiffs; that he failed to disclose exculpatory evidence before, during, and after the trial (including a calendar allegedly furnished to him that would have provided powerful support for Greco's alibi defense); and that he engaged in numerous artifices to conceal the identities of the actual killers.

Walsh labels these allegations "conclusory" and laments that the amended complaints present no fact-specific averments showing that he, as a municipal police officer, was privy to the

information gleaned from FBI informants and interviews. This counterattack fails.

The factual allegations pertaining directly to Walsh, combined with the plausible inferences that must be drawn in the plaintiffs' favor, suffice to survive a motion to dismiss. See Educadores, ___ F.3d at ___ [slip op. at 2]. Walsh was an active member of the joint federal-state task force — a fact that supports a plausible inference that he was privy to information gathered by the other members of the team (including Condon and Rico). It should have been obvious to a reasonable officer, confronted with these circumstances, that this behavior abridged the plaintiffs' constitutional rights.

In sum, we share the district court's view that, by 1967, "[no] reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." Limone, 271 F. Supp. 2d at 365-66. Taking the facts alleged in the amended complaints as true, we hold that neither appellant is entitled to qualified immunity at this juncture. We add, of course, that this ruling does not preclude the appellants from reasserting that defense, on a more fully developed record, either at summary judgment or at trial.

## III. THE FAVORABLE TERMINATION DEFENSE

Our work here is not done. Limone succeeded in having his conviction set aside in 2001, see Commonwealth v. Limone, 2001

-21-

WL 30494, at *8 (Mass. Super. Ct. 2001), and the district attorney subsequently declined further prosecution. Greco and Tameleo died in prison before they could secure similar remediation. In their motions to dismiss, the appellants argued that the lack of favorable terminations precludes the Greco and Tameleo plaintiffs from pursuing their claims for damages. See Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) (holding that a plaintiff, in order to recover damages for an allegedly unconstitutional conviction, must show a favorable termination of the underlying conviction); Figueroa v. Rivera, 147 F.3d 77, 80 (1st Cir. 1998) (same). The district court rejected this defense, holding that the Greco and Tameleo plaintiffs could ride piggyback on the vacation of Limone's conviction to satisfy the favorable termination requirement under a theory of "constructive reversal," or in the alternative, that any failure to secure favorable termination was excused by allegations of "government wrongdoing that effectively denied access to post-conviction remedies." Limone, 271 F. Supp. 2d at 361.

The appellants ask us to review this determination here and now. That request runs headlong into the general rule that only final judgments and orders are immediately appealable in civil cases. See Espinal-Dominguez v. Puerto Rico, 352 F.3d 490, 495 (1st Cir. 2003) (citing 28 U.S.C. § 1291). This rule admits of exceptions, however, and one judge-made exception allows for

-22-

interlocutory review of an order rejecting a qualified immunity defense so long as the order turns on a purely legal question. See, e.g., Stella, 63 F.3d at 73-74. The appellants assert that we may use this exception as a vehicle to review the Heck issue as well. We demur.

Federal courts long have recognized that interlocutory review of a denial of qualified immunity "does not in and of itself confer jurisdiction over other contested issues in the case." Roque-Rodriguez v. Lema Moya, 926 F.2d 103, 105 (1st Cir. 1991). To overcome this obstacle, the appellants invite us to embrace the seldom-used doctrine of pendent appellate jurisdiction. See Swint v. Chambers County Comm'n, 514 U.S. 35, 50-51 (1995); Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 123 (1st Cir. 2003). We decline the invitation.

The Supreme Court repeatedly has cautioned that exceptions to the final judgment rule should be narrowly construed. See, e.g., Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994). In an effort to avoid needless encroachments on the final judgment rule, we have been quite sparing in our endorsement of pendent appellate jurisdiction. See Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999) (noting that the exercise of pendent appellate jurisdiction is "discouraged"); Roque-Rodriguez, 926 F.2d at 105 n.2 (classifying this restraint as "self-imposed"). Thus, we have required that, at a bare minimum,

-23-

a party promoting the exercise of pendent appellate jurisdiction demonstrate either that the pendent issue is inextricably intertwined with the issue conferring the right of appeal or that review of the pendent issue is essential to ensure meaningful review of the linchpin issue. See, e.g., Nieves-Márquez, 353 F.3d at 123; Suboh v. Dist. Atty's Office of the Suffolk Dist., 298 F.3d 81, 97 (1st Cir. 2002); see also Clinton v. Jones, 520 U.S. 681, 707 n.41 (1997). Because these two considerations were limned by the Court in Swint, 514 U.S. at 51, we sometimes refer to them as the Swint criteria.

Here, the linchpin issue and the pendent issue cannot fairly be described as intertwined, let alone inextricably intertwined. Whereas the former (qualified immunity) focuses principally on the appellants' conduct leading up to the plaintiffs' convictions, the latter (favorable termination) entails an examination of post-conviction events. The fact that we already have conducted an exhaustive review of the district court's qualified immunity ruling without needing to touch upon the favorable termination issue, see supra Part II, makes manifest this lack of imbrication. By the same token, it conclusively proves that the exercise of pendent appellate jurisdiction is not essential to our ability to conduct meaningful review of the linchpin issue. On that score alone, this case is an unfit candidate for the invocation of pendent appellate jurisdiction.

The appellants strive to parry this thrust by arguing that failure to satisfy the <u>Swint</u> criteria should bar the exercise of pendent appellate jurisdiction only when the party appealing the linchpin issue and the party appealing the pendent issue are different. They posit that where, as here, the same parties seek review of both issues, pendent appellate jurisdiction may be justified on the basis of fairness and efficiency concerns. <u>See</u>, <u>e.g.</u>, <u>Jungquist</u> v. <u>Sheikh Sultan Bin Khalifa Al Nahyan</u>, 115 F.3d 1020, 1026-27 (D.C. Cir. 1997) (exercising pendent appellate jurisdiction on that basis when the same parties sought review of both issues); <u>Gilda Marx, Inc.</u> v. <u>Wildwood Exercise, Inc.</u>, 85 F.3d 675, 679 & n.4 (D.C. Cir. 1996) (declining to read fulfillment of the <u>Swint</u> criteria as an absolute condition precedent to the exercise of pendent appellate jurisdiction). They tell us that exercising pendent appellate jurisdiction in the instant case would allow for the early resolution of a potentially dispositive issue, thus catering to fairness and efficiency concerns.

We think that the appellants' position ignores reality. There is no sound reason why the identity of the parties should have decretory significance in deciding whether to exercise pendent appellate jurisdiction. This court has used the <u>Swint</u> criteria as the benchmark for pendent appellate jurisdiction in all sorts of cases, including cases in which the party appealing the pendent issue was also appealing the linchpin issue. <u>See</u>, <u>e.g.</u>, <u>Nieves-</u>

Márquez, 353 F.3d at 123; Suboh, 298 F.3d at 97.  So too the Second Circuit.  See Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 757 (2d Cir. 1998) (stating that "pendent issues raised by the party that has the right to bring an interlocutory appeal are at least as great a threat to the final-order scheme as are pendent issues raised by other parties").  Several other courts of appeals have likewise endorsed a universal application of the Swint criteria.  See id. at 758 (collecting cases).  Consequently, we hold explicitly that when a party who has the right to bring an interlocutory appeal on one issue attempts simultaneously to raise a second issue that ordinarily would be barred by the final judgment rule, we will not exercise appellate jurisdiction over the pendent issue unless one of the Swint criteria is satisfied.

Given this paradigm, instances demanding the exercise of pendent appellate jurisdiction are likely to be few and far between.  This is not one of them.  We conclude, therefore, that it would be ultracrepidarian — and wrong — for us to exercise pendent appellate jurisdiction over the favorable termination issue just for the Heck of it.

## IV.  CONCLUSION

We summarize succinctly.  At this early stage of the litigation, the appellants have not demonstrated their entitlement to qualified immunity.  Because that is the only issue properly before us on these interlocutory appeals, we need go no further.

-26-

**Affirmed**.