# United States Court of Appeals
## For the First Circuit

No. 05-1529

ROBERT DEPOUTOT,

Plaintiff, Appellant,

v.

JOHN RAFFAELLY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Schwarzer,* Senior District Judge.

Michael J. Sheehan for appellant.
Charles P. Bauer, with whom John T. Alexander and Ransmeier & Spellman, PC were on brief, for appellee.

October 4, 2005

_____

*Of the Northern District of California, sitting by designation.

**SELYA**, **Circuit Judge**. This case involves a meandering motorist who claims that the arresting officer violated his constitutional right to substantive due process at the touch of a button (wrongfully terminating a breath alcohol test administered after the plaintiff's arrest for drunken driving). The district court determined that the facts, even when viewed in the light most hospitable to the plaintiff's theory of the case, did not state a substantive due process claim and that, in all events, the officer was entitled to qualified immunity. After careful consideration, we affirm the district court's order.

## I.  BACKGROUND

As the district court resolved this case at the summary judgment stage, we rehearse the facts in the light most agreeable to the nonmovant (here, the plaintiff), consistent with record support. Brady v. Dill, 187 F.3d 104, 106 n.1 (1st Cir. 1999). Because the constitutionality of the arresting officer's decision to terminate the plaintiff's breath test lies at the core of this controversy, we focus on the facts available to the officer at the time of the test.

During the early morning hours of November 18, 2001, defendant-appellee John Raffaelly, a member of the Northfield, New Hampshire police department, arrested plaintiff-appellant Robert DePoutot on suspicion of driving while intoxicated. Raffaelly transported the plaintiff to a police station in nearby Laconia for

the purpose of administering a breath alcohol test. The plaintiff concedes that probable cause existed for the arrest and eschews any challenge to the officer's decision to conduct a further investigation.

The Laconia police department relies upon an "Intoxilyzer 5000" machine to measure blood alcohol content (BAC). The Intoxilyzer computes a subject's BAC on the basis of two breath samples. To generate a valid sample, the subject must exhale continuously into a tube connected to the Intoxilyzer for four seconds and provide the machine with approximately one liter of air. Each breath sample must be given within a separate two-and-one-half minute window; if the subject fails to provide a testable sample within either the first or second window, the machine automatically cancels the test.

Under New Hampshire law, the refusal of a person suspected of drunken driving to submit to a breath test results in an automatic license suspension, regardless of whether the person is ultimately convicted of violating any of the state's rules of the road. See N.H. Rev. Stat. Ann. § 265:92(I) (2004). Although the statute supplies no special definition of the term "refusal," the New Hampshire Supreme Court has explained that "[a] driver's entire conduct, not merely words expressing consent or refusal," informs the determination. Jordan v. State, 561 A.2d 1078, 1080 (N.H. 1989). Because a driver "must comply with all the procedures

necessary to produce accurate measurements of breath-alcohol levels," one who "expresses consent while intentionally preventing accurate testing" may be deemed to have refused to submit to the test within the meaning of the statute.  Id.

The plaintiff had a prior conviction for driving while intoxicated and, accordingly, did not come to the breath test as a stranger.  After re-familiarizing the plaintiff with the Intoxilyzer, Raffaelly informed him of his right, under state law, to obtain additional testing at his own expense.  See N.H. Rev. Stat. Ann. § 265:87.  Once Raffaelly had secured the necessary consent, see id. § 265:92, the breath test commenced.

During the first two-and-one-half minute window, the plaintiff experienced two false starts, exhaling a small amount of air into the tube but ultimately failing to generate a full sample. After the second failed attempt, Raffaelly re-instructed the plaintiff about the Intoxilyzer's proper operation and warned him that any subsequent failure to provide the required sample would be deemed a refusal to submit to the test.  On his third try, the plaintiff provided a satisfactory sample and the Intoxilyzer rated his BAC at 0.04 percent.  That was well below the level that, under New Hampshire law, comprised prima facie evidence of inebriation. See id. § 265:89 (specifying 0.08 percent as the threshold level). Consistent with his general practice, Raffaelly did not immediately disclose the results of this initial analysis to the plaintiff.

After processing this first sample, the Intoxilyzer automatically recalibrated and opened the second two-and-one-half minute window. Once again, the plaintiff failed to provide a testable sample on at least two attempts.[1] Raffaelly repeated both his procedural instructions and his warning that a subsequent failure to generate a suitable sample would be construed as a refusal to submit to the test. When the plaintiff's further efforts proved unsuccessful, Raffaelly pressed the machine's "R" button — an action that served to record the plaintiff's refusal and terminated the test. At that point, the two-and-one-half minute window for receiving the second breath sample had not yet closed.

The plaintiff asserts that while striving to provide the required breath samples, he "cough[ed]," "gagg[ed]," and repeatedly complained to Raffaelly that he was having trouble breathing. He also complained that Raffaelly's conduct was "scaring" him. And, finally, he says that he requested that a blood test rather than a

---

[1]The parties disagree as to the precise number of failed attempts that transpired before Raffaelly terminated the test. Raffaelly sets the number at four and the plaintiff's versions are inconsistent (in both his complaint and his objection to the motion for summary judgment, the plaintiff states that Raffaelly permitted him a total of four attempts to generate the second sample, but on appeal he contends that Raffaelly allowed him only two such attempts). As nothing turns on the point, we leave this discrepancy unresolved.

breath test be administered.[2] He acknowledges, however, that he never informed Raffaelly of any medical condition that might be interfering with his ability properly to perform the breath test.

Raffaelly denies that there were any objective indications that the plaintiff was physically unable to complete the test. From his coign of vantage, the plaintiff appeared to be obstructing the test either by holding his breath or by placing his tongue over the opening in the tube.

After the machine had registered the refusal, Raffaelly released the plaintiff from custody. The plaintiff repaired to a local hospital and obtained a blood test. A retrograde analysis of that sample, which was extracted more than two hours after the aborted breath test, suggested that the plaintiff's BAC was approximately 0.03 percent at the time of the breath test.

Raffaelly went ahead with the driving while intoxicated charge. Even though that charge eventually was dropped, New Hampshire state authorities administratively suspended the plaintiff's license for two years for refusing to submit to a breath test. The length of the suspension was based, in part, on the plaintiff's prior conviction for driving while intoxicated. See id. § 265:92(I)(b)(1).

---

[2]Although we take these facts as true for purposes of summary judgment, see Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990), we note that most of them are disputed.

The plaintiff availed himself of the state's administrative appeal procedure. See id. § 265:91-d. At a hearing held on January 4, 2002, he presented medical testimony that he suffered from occupationally induced asthma and that, although this condition may not have manifested itself in external signs, it likely prevented him from producing the required breath samples. Despite this evidence, the hearing officer found that the plaintiff had willfully refused the breath test and upheld the license suspension.

The plaintiff sought judicial review of the hearing officer's decision in state superior court. In July of 2002, that court, leaning heavily on the medical testimony and the allocation of the burden of proof, found the evidence insufficient to uphold the finding that the plaintiff had willfully refused to submit to a breath test. Hence, the court reversed the hearing officer's decision and restored the plaintiff's driving privileges.

The plaintiff then filed suit against Raffaelly in the federal district court. Pertinently, he invoked 42 U.S.C. § 1983 and asserted a substantive due process claim.[3] The allegedly offending conduct was Raffaelly's premature termination of the breath test.

---

[3]The plaintiff's complaint also contained pendent state law claims. These claims are outside the purview of this appeal.

Following discovery, the district court granted Raffaelly's motion for summary judgment. The court held, first, that Raffaelly's conduct was not sufficiently conscience-shocking to constitute a violation of the substantive component of the Fourteenth Amendment's Due Process Clause. As a fallback, the court concluded that, in all events, Raffaelly would be entitled to the protection of qualified immunity. This timely appeal ensued.

## II. ANALYSIS

Our analysis proceeds in two stages. First, we set out the summary judgment standard. Then, after mapping the landscape of substantive due process, we turn to the merits of the plaintiff's claim.

### A. The Rule 56(c) Standard.

In adjudicating a motion for summary judgment, a district court construes the facts "in the light most amiable to the nonmovant[] and indulge[s] all reasonable inferences favorable to [him]." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). The Civil Rules empower the court to render summary judgment only when this portrait of the case depicts "no genuine issue as to any material fact" and establishes "that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is "genuine" if "it may reasonably be resolved in favor of either party" and, therefore, requires the finder of fact to make "a choice between the parties' differing

versions of the truth at trial." Garside, 895 F.2d at 48 (citations and internal quotation marks omitted). Material facts are those that "possess the capacity to sway the outcome of the litigation under the applicable law." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (citation and internal quotation marks omitted).

A party seeking to establish a genuine issue of material fact must offer more than "effusive rhetoric and optimistic surmise." Id. Rather, the party must demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists. Id. Factual specificity is required; a conglomeration of "conclusory allegations, improbable inferences, and unsupported speculation" is insufficient to discharge the nonmovant's burden. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

We review the district court's entry of summary judgment de novo. Garside, 895 F.2d at 48. In conducting that tamisage, we employ the same criteria that guide a trial court's first-instance adjudication of a motion for summary judgment. See Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004).

## B. Substantive Due Process.

The Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That proscription applies

fully to a state's political subdivisions, including municipalities and municipal agencies.  Home Tel. & Tel. Co. v. City of Los Angeles, 227 U.S. 278, 286-87 (1913).  The touchstone of this due process guarantee is the "protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974).

The Due Process Clause has both procedural and substantive components.  In its procedural aspect, due process ensures that government, when dealing with private persons, will use fair procedures.  See, e.g., Fuentes v. Shevin, 407 U.S. 67, 80-82 (1972).  In its substantive aspect, due process safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them.  Daniels v. Williams, 474 U.S. 327, 331 (1986).  This case involves only the latter branch of the Due Process Clause.

As the Supreme Court recently has explained, the criteria used for identifying government action proscribed by the constitutional guarantee of substantive due process vary depending on whether the challenged action is legislative or executive in nature.  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). In the realm of executive action, the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," nor does it "guarantee due care" by government officials.  Id. at 848-49.  This

is as it should be; were the law otherwise, the Constitution would be downgraded to a "font of tort law." Id. at 848 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).

Consequently, an abuse of power practiced by the executive branch of state government sinks to a level cognizable under the Due Process Clause only when it is so extreme and egregious as to shock the contemporary conscience. Id. at 846. Moreover, because "executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims," the question of whether the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized. Id. at 847 n.8.

This case involves executive branch action. Thus, we must proceed incrementally. First, we must determine whether the official's conduct shocks the conscience. See id. Only if we answer that question affirmatively can we examine what, if any, constitutional right may have been violated by the conscience-shocking conduct and identify the level of protection afforded to that right by the Due Process Clause.[4] See id.

---

[4]The parties correctly note that our pre-Lewis jurisprudence paved two avenues that a plaintiff might travel in pursuing a substantive due process claim. See, e.g., Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 531 (1st Cir. 1995) (indicating that a plaintiff may establish a violation of substantive due process by showing either the deprivation of a fundamental right or conduct that shocks the conscience). Lewis, however, clarified the

While the "shock the conscience" standard is imprecise, it is a helpful guide. See id. at 847; Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.). Conceptually, it does not replicate, or even draw upon, negligence law. Rather, this metric "points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." Lewis, 523 U.S. at 848. It is, therefore, readily apparent that negligent conduct, simpliciter, is categorically insufficient to shock the conscience. Id. at 849. Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in "conduct intended to injure in some way unjustifiable by any government interest." Id.

Consistent with these principles, we have stated that "the requisite arbitrariness and caprice" for a conscience-shocking executive action "must be stunning, evidencing more than humdrum legal error." Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process. Id. at 757. Courts regularly have required something more egregious and more extreme.

---

law of substantive due process and made pellucid that conscience-shocking conduct is an indispensable element of a substantive due process challenge to executive action. See Lewis, 523 U.S. at 846-47; see also Hawkins v. Freeman, 195 F.3d 732, 738-39 (4th Cir. 1999) (en banc) (underscoring the "shock the conscience" prerequisite in executive action cases).

Our precedents with respect to substantive due process claims generally and with respect to claims against law enforcement officers particularly are difficult to summarize because, by their nature, such decisions are almost always highly dependent on context and detail. Examples of past violations include the intentional framing of innocent citizens for serious crimes they did not commit, see Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004), and cases involving "extreme or intrusive physical contact," Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995). By way of contrast, we have found no substantive due process liability in situations in which law enforcement officers committed reprehensible but less egregious acts, such as deliberately shoving a pedestrian, see Cummings v. McIntire, 271 F.3d 341, 345 (1st Cir. 2001), or participating in reckless high-speed car chases resulting in fatalities, see Boveri v. Town of Saugus, 113 F.3d 4, 7 (1st Cir. 1997); Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996).

Against this backdrop, we turn to the case at hand. The "shock the conscience" inquiry requires a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking. Lewis, 523 U.S. at 850. Viewing the totality of the circumstances here, we conclude, as did the district court, that Raffaelly's conduct, whether or not letter perfect, was reasonable under the circumstances and proportionate to the governmental interest at stake. Even under the plaintiff's

-13-

version of events, the officer committed no act so extreme, egregious, or outrageously offensive as to shock the contemporary conscience. It follows inexorably that his conduct did not sink to the level of a substantive due process violation.

This entire episode commenced with an arrest, backed by probable cause woven out of the plaintiff's erratic driving, the odor of alcohol wafting from his car, his admission that he had been imbibing, and his inability to pass two out of four roadside sobriety tests. It is beyond hope of contradiction that police officers charged with administering sobriety tests must remain on the lookout for creative evasions designed to cloak refusal in the raiment of compliance. See, e.g., Jordan, 561 A.2d at 1079 (describing a suspected drunk driver who, after apparently consenting to a breath test, intentionally belched in an attempt to disrupt the reading). Especially given the inauspicious beginnings of his encounter with the plaintiff, it was reasonable for Raffaelly to be suspicious when the plaintiff subsequently displayed a serial inability to perform a simple breath test. This is all the more so since, by the plaintiff's own admission, he did not inform Raffaelly of any medical condition that might have disabled him from performing the breath test.

In short, Raffaelly's on-the-spot conclusion that the plaintiff was obstructing the test, whether or not correct, was not unreasonable under the circumstances. Indeed, that conclusion

-14-

finds support from an unexpected source: the plaintiff's medical expert.  The doctor testified at the administrative hearing that someone with the plaintiff's condition might appear "fine" to an uninformed observer and might exhibit no outward signs of the illness.  He also testified that the plaintiff's breathing problem would have created an effect similar to that caused when a test subject blocks the Intoxilyzer tube with his tongue.

The chronology of events further supports the objective reasonableness of Raffaelly's actions.  Despite the fact that he suspected the plaintiff of hindering the breath test, he instructed the plaintiff on the proper performance of the test at least three times and afforded him a minimum of five attempts to provide two testable samples.  Moreover, he twice forewarned the plaintiff that a failure to produce the required sample would be deemed a refusal.  Whether or not, with the benefit of hindsight, Raffaelly's conclusion that the plaintiff had sabotaged the test looks like a mistaken judgment, it was not so wanton and unfounded an act as to shock the conscience.

In an effort to blunt the force of this reasoning, the plaintiff insists that he repeatedly implored Raffaelly to substitute a blood test for the breath test.  Assuming, for argument's sake, that the plaintiff made these requests during the administration of the breath test — Raffaelly insists that the plaintiff did not voice his preference for a blood test until after

the breath test had been terminated — that fact does not alter the decisional calculus. New Hampshire law requires an officer requesting a breath test to advise the subject of his right to obtain <u>additional</u> blood testing at his own expense.[5] <u>See</u> N.H. Rev. Stat. Ann. § 265:86. This paradigm does not afford the motorist a choice between different forms of testing. The initial election between available methods of measuring a suspect's BAC is committed to the arresting officer's discretion. <u>See</u> <u>id.</u> § 265:92(I); <u>cf.</u> <u>State</u> v. <u>Winslow</u>, 666 A.2d 946, 948 (N.H. 1995) (rejecting a due process challenge by a suspect requesting an additional blood test where the arresting officer refused to provide him with transportation to the testing site). Certainly, then, Raffaelly's legally authorized decision to utilize the standard breath test procedure over the plaintiff's generalized objection to that form of testing, undertaken without any knowledge of the plaintiff's idiosyncratic asthma condition, is not the kind of conscience-shocking act on which a substantive due process claim can be premised.

The plaintiff's attempt to cast his claim in the image of <u>Limone</u> is disingenuous. <u>Limone</u>, which arose on an interlocutory appeal from the denial of a motion to dismiss, involved two law enforcement officers who allegedly suborned perjured testimony in

---

[5]The parties agree that Raffaelly complied with this obligation on the date of the stop.

order to frame innocent men for murder. Limone, 372 F.3d at 43. In rejecting the officers' claim that this conduct was protected by qualified immunity, we wrote:

> This is easy pickings. Although constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).

Id. at 44-45 (citation omitted).

The plaintiff hypothesizes that Raffaelly intended, through the premature termination of the breath test, to "manipulate the evidence" against him. That sort of conduct, he says, is indistinguishable from the unconstitutional actions of the Limone defendants. On this view of the case, Raffaelly "knew" that he could no longer obtain a conviction against the plaintiff for driving while intoxicated (after all, the one reading that he had obtained showed a 0.04 percent BAC), so he decided to fabricate a refusal to submit and pressed the "R" button to effectuate that end.

This is pie in the sky. Although we must take the facts in the light most favorable to the nonmovant (here, the plaintiff) and draw inferences accordingly, Garside, 895 F.2d at 48, those

-17-

inferences must be reasonable. Here, there is nothing, apart from the plaintiff's unsubstantiated speculation, to indicate that Raffaelly intended to falsify evidence of a refusal to submit to a breath test.

Contrary to the plaintiff's importunings, the BAC of 0.04 percent recorded on the completed breath sample is not proof of that point. Raffaelly testified to his belief that, regardless of the aborted breath test, the plaintiff still could be convicted of driving while intoxicated based on his (Raffaelly's) observations during the traffic stop. Consistent with that belief, Raffaelly, after terminating the breath test, signed a formal complaint charging the plaintiff with driving while intoxicated. Raffaelly's unrefuted testimony regarding his lack of familiarity with the prosecutorial decisionmaking process similarly suggests that he had no basis for "knowing" that, once the first breath sample was recorded, the plaintiff could no longer be convicted of driving while intoxicated.

Moreover, Raffaelly's avowed belief that the plaintiff could be convicted for driving while intoxicated even after the analysis of the first breath sample comports with New Hampshire's statutory scheme. Under that regime, a BAC reading below 0.08 percent does not automatically exonerate a motorist. Rather, evidence that a suspected drunk driver had a BAC between 0.03 and 0.08 percent is "relevant" evidence and "may be considered with

-18-

other competent evidence in determining the guilt or innocence" of a person charged with driving while intoxicated.  N.H. Rev. Stat. Ann. § 265:89.  Thus, the BAC reading on the plaintiff's first breath sample did not conclusively prove his innocence.

To cinch matters, the uncontradicted evidence shows that Raffaelly administered the test according to established procedure and made a discretionary determination that the plaintiff was refusing to submit to the test — a determination entrusted to him by New Hampshire law.  See N.H. Rev. Stat. 265:92(I); see also Jordan, 561 A.2d at 1080.  That determination, though quite possibly incorrect, had a reasonable basis in the facts known to Raffaelly at the time.  The bottom line is that the record evidence and the reasonable inferences extractable therefrom will not support a finding that Raffaelly touched the "R" button with the malicious intention of fabricating a nonexistent refusal. Consequently, there was no substantive due process violation.[6]

## III.  CONCLUSION

We need go no further.  Because the plaintiff's evidence, even when viewed in the light most flattering to him, fails to sustain a finding that Raffaelly committed a conscience-shocking

---

[6]We add that even if the record supported an inference that Raffaelly had intentionally fabricated a nonexistent refusal — which it does not — a showing of malicious intent would not necessarily suffice, in the circumstances of this case, to shock the contemporary conscience.  Cf., e.g., Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 624 (1st Cir. 2000); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).

act, the district court correctly granted summary judgment in Raffaelly's favor on the substantive due process claim.[7] That being so, the district court's follow-on decision to dismiss the plaintiff's state law claims without prejudice was well within the realm of its discretion. See 28 U.S.C. § 1367(c)(3); see also Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995).

**Affirmed**.

---

[7]As we have decided this appeal under the "shock the conscience" prong of the substantive due process standard applicable to executive action cases, we need not address the district court's alternative holding that Raffaelly was, at the very least, entitled to qualified immunity.